162 N.J. Super. 60 (1978)
392 A.2d 216
NEW JERSEY BELL TELEPHONE COMPANY, APPELLANT,
v.
STATE OF NEW JERSEY, DEPARTMENT OF PUBLIC UTILITIES, BOARD OF PUBLIC UTILITY COMMISSIONERS, RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued February 28, 1978.
Decided August 21, 1978.
*66 Before Judges MATTHEWS, CRANE and ANTELL.
Mr. Adrian M. Foley, Jr. and Mr. Bernard M. Hartnett, Jr. argued the cause for appellant (Mr. Foley, Mr. Hartnett and Mr. Richard C. Schramm, attorneys; Mr. Howard T. Rosen, of counsel).
Mr. Bertram P. Goltz, Jr., Deputy Attorney General, argued the cause for respondent Board of Public Utilities (Mr. John J. Degnan, Attorney General of New Jersey, *67 attorney; Mr. William F. Hyland, former Attorney General of New Jersey; Mr. Stephen Skillman, Assistant Attorney General, of counsel; Mr. Mark A. Geannette, Deputy Attorney General, on the brief).
Mr. William Gural and Mr. John A. Hoffman argued the cause for respondent Department of the Public Advocate Division of Rate Counsel (Mr. Stanley C. Van Ness, Public Advocate, attorney; Mr. Alfred C. Koeppe, Mr. Menasha J. Tausner and Ms. Dolores Pegram Wilson, rate counsel).
The opinion of the court was delivered by ANTELL, J.A.D.
Based on a claim of unconstitutional confiscation of property by the Board of Public Utility Commissioners (Board) the New Jersey Bell Telephone Company (company) seeks a de novo review and determination of its application for a rate increase. Confiscation is averred on the claim that the Board (1) illegally arrived at its findings as to rate base, income and expense and rate of return and (2) failed to make essential findings and conclusions. Bluefield Watermarks & I. Co. v. Public Service Comm'n, 262 U.S. 679, 690, 43 S.Ct. 675, 67 L.Ed. 1176 (1923); In re New Jersey Power & Light Co., 9 N.J. 498, 535 (1952). The company maintains that the Board ignored the findings and recommendations of its hearing examiners and reached its result by inflating revenues, disallowing expenses and reducing rate base arbitrarily. Also alleged as the basis for relief from the rate determination is the Board's noncompliance with the Administrative Procedure Act, N.J.S.A. 52:14B-1 et seq., and the Open Public Meetings Act, N.J.S.A. 10:4-6 et seq. Finally, we are asked to reverse the action of the Board in rejecting the company's plan for directory assistance charging and in imposing on the company its program for lifeline rates.
To explain the Board's conduct the company brings to our attention the fact that some 2 1/2 months before this proceeding was begun the company received rate relief in the *68 form of increases designed to produce $60,000,000 in additional revenues through a 12% rate of return on equity. Therefore, the recurrent theme of this appeal is the company's contention that the action below is befouled by the fact that the Board arrived at a "predetermined result" which was motivated by its desire "to punish appellant for its early refiling and to discourage other utilities from filing rate cases too rapidly."
The previous filing by the company occurred in April 1974 and the order allowing the rate increase was entered September 18, 1975. The present petition was filed December 2, 1975 for approval of rate increases promising additional annual revenues of $174,600,000, voluntarily reduced April 30, 1976 to $157,800,000. The increases were scheduled to become effective January 1, 1976 and their operation was suspended by the Board pursuant to N.J.S.A. 48.2-21(d) on December 4, 1975. Sixty-three public hearings were conducted between January 26, 1976 and June 25, 1976, generating a record of approximately 7,500 pages of transcript and 489 physical exhibits. On August 23, 1976 the two hearing examiners issued their "Report and Recommendations on Revenue Requirements" and the three members of the Board delivered their oral opinions on November 3, 1976. The Board's formal decision and order was filed November 5, 1976.
The hearing examiners recommended a fair value rate base of $2,050,057,000. The Board's finding on rate base was $1,999,646,000. The respective recommendations of the hearing examiners and the finding of the Board as to fair rate of return on rate base were as follows:

 Tobia 8.86%  $56,512,000
 McAfoos 8.64%  39,165,000
 Board 8.49% 374,000 over-recovery

The following findings were made as to test year operating income:

*69
 Tobia $151,494,000  7.4% of rate base
 McAfoos 155,458,000  7.6% of rate base
 Board 169,951,000  8.5% of rate base

The following recommendations and conclusion were arrived at with respect to a reasonable rate of return on equity:

 Tobia 12.75%
 McAfoos 12.25%
 Board 12%

Hearing Examiner Tobia recommended 12.5% to 13% as a fair range of return on equity, and McAfoos recommended 11.75% to 12.75%. The rates of return testified to as reasonable by the witnesses ranged between 11.29% and 15%. The company urges that in the exercise of our independent judgment we order a return on equity of 13%, citing as precedent New England T. and T. Co. v. Dept. of Pub. Util., Mass., 354 N.E.2d 860 (Sup. Jud. Ct. 1976).
It is clear that in this State the courts have no power to fix rates. This "is not a judicial function, but a legislative one, and the State has created the Board of Public Utility Commissioners as its agent for that purpose." In re Intrastate Industrial Sand Rates, 66 N.J. 12, 19 (1974); Public Service Coord. Transport v. State, 5 N.J. 196, 224 (1950). Accordingly, by statute we are authorized only to set aside the agency's order where "it clearly appears that there was no evidence before the board to support the same reasonably or that the same was without the jurisdiction of the board." N.J.S.A. 48:2-46.
The company argues that our duty to make independent findings of law and fact follows from the fact that a claim of confiscation has been made, citing Atlantic City Sewerage Co. v. Bd. Pub. Utility Comm'rs, 128 N.J.L. 359, 364 (Sup. Ct. 1942), aff'd o.b. 129 N.J.L. 401 (E. & A. 1943), and N.J. Suburban Water Co. v. Bd. Public Utility Comm'rs, 123 N.J.L. 303, 308 (E. & A. 1939), cert. denied *70 sub nom. McGregor v. Bd. of Public Utility Comm'rs, 309 U.S. 663, 60 S.Ct. 582, 84 L.Ed. 1010 (1940). Where a claim of confiscation fails, and a challenge remains to the reasonableness of the rate it is said that the court should "weigh the evidence and resolve for itself the issue of reasonableness." In re Intrastate Industrial Sand Rates, supra, 66 N.J. at 21; In re New Jersey Power & Light Co., supra, 9 N.J. at 508; Public Service Coord. Transport v. State; supra, 5 N.J. at 215. But the claim of confiscation "is meritorious only where the rate base determination, allowances of income and operating expense, and finding of rate of return are illegally arrived at or are not found." In re New Jersey Power & Light Co., supra 9 N.J. at 535. And, although not a strong presumption, Public Service Coordinated Transport, supra 5 N.J. at 215-216, the Board's action is, where the issue of reasonableness has been raised, presumably valid since its exercise of the rate-making power involves "a broad measure of legislative discretion." In re New Jersey Power & Light Co., supra 9 N.J. at 508. As the court said in State v. N.J. Bell Tel. Co., 30 N.J. 16 (1959):
So long as the determination of the rate base reflects the reasonable judgment of the Board and is grounded upon sufficient relevant and competent evidence, it is not the judicial province to interfere in what is essentially a legislative function. [at 29-30]
In selecting its approach to the problem before it the Board is free to act as it sees fit provided that
* * * the formula adopted be, from the reasoning of the Board based upon the evidence presented, i.e., its expertise in these matters, rationally related to the problem attacked. [at 36]
In fact, it has been held that "the Legislature in Title 48 intended to delegate the widest range of regulatory power over public utilities to the PUC." Deptford Tp. v. Woodbury Terrace Sewerage Corp., 54 N.J. 418, 424 (1969).
*71 Although the language of some, with their allusions to weighing the evidence, could support a literal interpretation to the contrary, we conclude that none of our pertinent precedents support the company's contention that it is entitled to a de novo review merely upon a claim of confiscation or unreasonableness. The practice was otherwise prior to the 1947 Constitution. But rate determinations at that time received judicial review by certiorari, the scope of which was governed by R.S. 2:81-8 with its mandatory requirement for independent fact-finding. Atlantic City Sewerage Co. v. Bd. Pub. Utility Comm'rs, supra, 128 N.J.L. at 364. Furthermore, such review appears to have been made necessary by then prevailing opinions of the United States Supreme Court. See Ohio Valley Water Co. v. Ben Avon Borough, 253 U.S. 287, 289, 40 S.Ct. 527, 64 L.Ed. 908 (1920); N.J. Suburban Water Co. v. Bd. Pub. Utility Comm'rs, supra, 123 N.J.L. at 308. That the scope of review is now greatly limited is free of doubt. Close v. Kordulak Bros., 44 N.J. 589 (1965). As the Supreme Court there explained:
Pursuant to the constitutional mandates, this court promulgated rules governing the practice in workmen's compensation appeals to the County Court and in matters formerly determined through the prerogative writs. As to the former, we have continued to recognize the legislative policy decision that the appeal from the Division should be de novo on the record in the County Court. R.R. 5:2-5 (d). Procedure in lieu of prerogative writs was prescribed by Rule 3:81, now R.R. 4:88. It was provided that review of statutory proceedings in the Superior and County Courts shall be in the Appellate Division with the review to proceed in the same manner as appeals from the trial divisions. Rule 3:81-7 as amended March 25, 1949, now R.R. 4:88-7. Review of the final decision or action of any state administrative agency was directed to be by appeal to the Appellate Division, the appeal to proceed in the same manner as appeals from the trial divisions. Rule 3:81-8, now R.R. 4:88-8. It is most significant that from the very beginning of the new system, Rule 3:81-13 (now R.R. 4:88-13) prescribed:
"In proceedings [in lieu of prerogative writs] the Court shall have the power to review the facts and make independent findings thereon, which power may be exercised by it to such extent as the interests of justice may require."
*72 Nothing could be clearer than that it was not intended that the Appellate Division should be required to make new and independent findings of fact in appeals in lieu of prerogative writs from statutory proceedings and state administrative agencies. The Appellate Division uniformly so held in compensation cases from its establishment in 1948 until the decision in Russo. See, e.g., Carpenter v. Calco Chemical Division, American Cyanamid Co., 4 N.J. Super. 53 (App. Div. 1949); Hagerman v. Lewis Lumber Co., 24 N.J. Super. 120 (App. Div. 1952), affirmed 13 N.J. 315 (1953); Mewes v. Union Building & Construction Co., 45 N.J. Super. 88 (App. Div. 1957), certif. den. 24 N.J. 546 (1957). No obligation to make new fact findings has been judicially imposed or understood to be requisite in Appellate Division review under R.R. 4:88 of any other types of proceedings. [at 596-597]
We note that the rule provision quoted in the foregoing excerpt was deleted effective April 1, 1975. See R. 4:69-4.
Thus, on the question of confiscation we may decide only whether the essential findings were either illegally arrived at or not made, In re New Jersey Power & Light Co., supra, 9 N.J. at 535, and as to whether the rates approved are "just and reasonable," N.J.S.A. 48:2-21(b) (1), we may weigh the evidence only to ascertain whether the Board's determination finds "reasonable support in the evidence." Id. at 509. In connection therewith the burden of proof rests on the public utility. Id.; Public Service Coord. Transport v. State, supra, 5 N.J. at 219; N.J.S.A. 48:2-21(d). In no way can findings be tested for support in the evidence except through the process of weighing and examining, and it is in this sense only that the duty to weigh the evidence is enjoined upon us. As the Supreme Court stated it, "It is our duty to weigh the evidence under the pertinent legal principles and determine whether the issue of reasonableness has been properly considered and decided." In re New Jersey Power & Light Co., supra, 9 N.J. at 508. The test is not materially distinguishable from the standard of substantial credible evidence applied in Close v. Kordulak Bros., supra, 44 N.J. at 599, with its carefully placed emphasis on agency expertise and the agency's opportunity to judge the credibility of the witnesses. See Central R. Co. of N.J. v. *73 Public Utilities Dept., 7 N.J. 247, 260 (1951): "[T]here must be sufficient or substantial competent and relevant evidence to support the findings of fact and reasonableness of the rates established by the Board."
No violation of federal constitutional standards comes about by the failure to provide de novo review. Such standards were articulated in the following language of In re Permian Basin Area Rate Cases, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968):
It follows that the responsibilities of a reviewing court are essentially three. First, it must determine whether the Commission's order, viewed in light of the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority. Second, the court must examine the manner in which the Commission has employed the methods of regulation which it has itself selected, and must decide whether each of the order's essential elements is supported by substantial evidence. Third, the court must determine whether the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable. The court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors. [at 791-792, 88 S.Ct. at 1373]
Involved in the determination of reasonableness are an examination of the company's rate base, its income and expenses, and the rate of return which is developed by relating its income to its rate base. The rate base is the fair value of the property of the public utility that is used and useful in the public service. In re Intrastate Industrial Sand Rates, supra, 66 N.J. at 22; In re New Jersey Power & Light Co., supra, 9 N.J. at 509; Public Service Coord. Transport v. State, supra, 5 N.J. at 217. To meet constitutional standards the rate of return must be sufficient to permit the company to maintain its financial integrity, attract capital needed to serve the public, and provide a return to the equity owner commensurate with the returns on investment *74 in other enterprises having corresponding risks. Federal Power Com'n v. Hope Natural Gas Co., 320 U.S. 591, 603, 64 S.Ct. 281, 88 L.Ed. 333 (1944); Bluefield Waterworks & I. Co. v. Public Service Comm'n, supra, 262 U.S. at 692-93, 43 S.Ct. 675.
We can say, however, that the rate which a public utility may reasonably charge should be sufficient to encourage good management and furnish a reward for efficiency, to enable the utility, under efficient and economical operation, to maintain and support its credit; and to enable it to raise money necessary for the proper discharge of its public duties. It can never be more than the reasonable worth of the service supplied; neither can it be fixed so low as to be confiscatory. If within these limits and supported by competent evidence, rates set by the Board would clearly be just and reasonable. [Public Service Coord. Transport v. State, supra, 5 N.J. at 225]
The company's confiscation argument leans heavily upon the premise that the Board had determined to deny its application for punitive purposes and also to discourage early refilings by other utilities. This is posited on statements made by two of the commissioners in the course of their oral opinions on November 3, 1975. These deliverances do contain allusions to early refilings and expressions indicating a desire "to alert other utilities to the Board's position in this case." But, at best, these are only ambiguous indicators of whether the decision-making process was governed in part by the Board's prejudices or by other factors of an interpretive nature. For example, an explanation seen by one commissioner for so early a refiling was that the company was dissatisfied with the earlier rate increase and not the company's genuine conviction that economic circumstances had so changed that a further increase was warranted.
Read in context the commissioner's remarks do not demonstrate that the Board acted out of bias. It has not been demonstrated that the commissioners approached their work with other than a proper sense of responsibility and that the references to early refiling were intended to convey anything more than their belief that whatever changes there had been *75 in the company's position during the interim were for the better and that for this reason the present application was unjustified. We therefore find to be without merit the company's contention that the Board denied rate relief for predetermined reasons unrelated to the merits of its application.
In further support of its confiscation argument the company maintains that "[t]he crucial defect of the Board's Decision lies in its failure to make the statutorily and constitutionally required findings." It is said that one such deficiency is the absence of "an ultimate jurisdictional finding of fact * * * that the rates approved are `just and reasonable,'" citing N.J.S.A. 48:2-21(b)(1). We conclude, however, that such a finding is sufficiently expressed in the following language of the decision and order under review:
We have been guided by these principles below, which have us look to the ultimate conclusions  such as the financial integrity of the utility and its credit, its ability to finance needed construction, its ability to provide a reasonable return to investors commensurate with their risk and its ability to provide safe, adequate and proper service.
We believe we have discharged our duty to arrive at a just conclusion predicated on a reasonable basis.
We believe that within the current parameters which we have set on rate base, revenue and expense, and rate of return, this utility will generate sufficient earnings at current rates to discharge its obligations to investors and fulfill its duties to the public, as well as being able to initiate a new "lifeline" rate for qualified usage consumers.
We further find unconvincing on the confiscation question the company's claim that the decision and order of the Board failed to explain satisfactorily its reasons for arriving at a 12% return on equity in the face of the hearing examiners' recommendations for a higher return. While it left some factors out of its discussion, the Board's decision nevertheless constituted an adequate statement of its reasons for refusing to increase the rate of return. What received chief emphasis by the Board was its conclusion that the company's financial status had been stabilized since the *76 previous rate increase and that the then improving economic climate pointed to further improvement in the future. However, it did not overlook other critical issues. It noted the controversy as to using the discounted cash flow methodology in calculating the cost of equity and resolved it by adopting Examiner McAfoos' analysis. This favored its use after considering other measuring devices, such as debt-equity spreads, comparable risks and market-to-book ratios. It gave consideration to rate allowances made by regulatory agencies in other jurisdictions and took account of inflationary factors which might affect the company's earnings.
It also found that inflation had been reduced from a rate of 12% to 6% since the previous rate proceeding, long-term debt had come down from 9% to 8%, that the parent company's stock had risen about 30% and enjoyed a market-to-book ratio of 1.1, that the Company took an over-recovery equal to 35 basis points on overall rate of return, that its net income for the first nine months of 1976 was $127,000,000 as against $102,000,000 in 1975, and $45,000,000 for third quarter 1976 as against $34,000,000 for third quarter 1975. These findings lend reasonable support to the Board's determination denying the increase and discredit the company's claim of confiscation.
The difference in viewpoint between the Board and the hearing examiners is not nearly so pronounced as the company suggests. Essentially, the examiners felt that since the industry had become increasingly competitive following the previous award, and other factors, such as pending antitrust litigation, had intervened to produce a greater degree of business risk, some improvement should be permitted in order to allow the company to consolidate the "substantial gains" it had made in previous proceedings. But it is clear to us that the Board came to the reasoned conclusion that the company's improved financial condition, the reduced rate of inflation and the reductions in cost of borrowing outweighed the effects of increased competition to the point that no increase was required. This is where their difference lies. Although the decision *77 and order of the Board did not coincide with the recommendations made by the hearing examiners,
* * * [I]n the last analysis it is the agency's function, not the Examiner's, to make the findings of fact and select the ultimate decision, and where there is substantial evidence supporting each result it is the agency's choice that governs. [Greater Boston Television Corp. v. F.C.C., 143 U.S. App. D.C. 383, 395, 444 F.2d 841, 853 (D.C. Cir.1970), cert. den. 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971)]
Nor is it reasonably to be expected that the Board should discuss each of the evidentiary items analysed by the examiners. Oil, Chemical & Atomic Workers Int'l U., Local 4-243 v. N.L.R.B., 124 U.S. App. D.C. 113, 116, 362 F.2d 943, 946 (D.C. Cir.1966). And in technical matters which lie within the special competence of the administrative tribunal, the courts will defer to the agency's expertise. In re Application of Howard Savings Bk., 143 N.J. Super. 1, 11 (App. Div. 1976).
Although the company correctly states that rate-making, "a predictive science," must function so as to yield a reasonable return during the period when the rates will be in effect, In re Intrastate Industrial Sand Rates, supra, 66 N.J. at 28; In re Board's Investigation of Tel. Cos., 66 N.J. 476, 494 (1975), we disagree that the Board's decision failed to take into account the Company's future requirements. The Board's forecast for the future sufficiency of the prevailing rates is unmistakably reflected in its findings and conclusions as to the company's improved financial position and improvements in the general economy. The company's favorable economic prospects under the rates allowed could not have been more plainly expressed as an element of the rate determination.
The company next contends that the Board erroneously refused to allow an adjustment to rate base for wage increases beyond the test year that were already negotiated. These wages would eventually become part of the plant cost, it is argued, and the adjustment purported to allow for the increase in costs that would cause attrition in the rate of *78 return. See State v. N.J. Bell Tel. Co., supra, 30 N.J. at 27. The Board gave among its reasons for rejecting the hearing examiners' recommendation that the adjustment be allowed the following which we regard as valid: (1) that this is consistent with the treatment of other utilities in recent cases and (2) its belief that the rate base should remain at original cost with the allowance for increasing costs to be made at some other point in a rate setting. Id. at 26, 35-36. In effect the Board concluded that the adjustment would constitute a form of "trending" plant costs, a technique which has "serious drawbacks." Id. at 26.
Bearing in mind the legislative nature of the rate-making process and the fact that the Board is not obliged to follow any particular formula, Id. at 36, we discern no occasion for judicial intervention.
The Board also adjusted operating income to reflect savings resulting from the filing of a consolidated tax return by AT&T, the company's parent company, for itself and its subsidiaries. Savings are realized from such a filing because the subsidiary company benefits from the interest payment deductions flowing from the debt capital in the parent corporation's capital structure. The company argues that this adjustment should not have been made for the reason that it was not done in an earlier case in which the company was a party, Docket No. 722-153. However, the reason for refusing the adjustment in that case, as the Board there made clear, was the paucity of information about a certain 1% license contract charge made to New Jersey Bell for AT&T's services and whether it was fixed with the tax arrangement in mind. But the Board noted that the principles of the consolidated tax return adjustment seemed to be logical. Furthermore, as the Board also stated, an adjustment for consolidated tax savings has been the Board's regular policy, having made it consistently for water companies and electric utility holding companies. In In re New Jersey Power & Light Co., supra, 9 N.J. at 528, the Supreme Court approved such an adjustment, reserving its only criticism for the *79 fact that only 50% of the savings was allowed. Also see Mountain States Tel. & Tel. Co. v. Public Utilities Com., Colo., 576 P. 2d 544, 549-551 (Sup. Ct. 1978). We find no merit to the company's appeal from this adjustment to operating income.
In view of the fact that it had allowed wage increases for future years as part of the company's operating expenses, the Board allowed as an offset against this increase the anticipated increase in worker productivity on the reasoning that less compensable manpower would be required to obtain the same level of output. The company claims that this adjustment is not ordinarily made in rate cases and demonstrates "still another glaring illustration of [the Board's] inconsistency of regulation."
We find, however, that the Board reviewed the factors which it felt supported its conclusion, i.e., the projected productivity increase of 5.6% annually, the then current inflation rate of less than 10% and the adjustment itself of 3% which left incentive for the company to increase productivity further. It also embraced within its findings the recommendations of Hearing Examiner McAfoos who recommended the adjustment. We see no reason to disturb the conclusion arrived at by the Board. It is supported by substantial credible evidence and lies well within the expertise of the agency. Close v. Kordulak Bros., supra, 44 N.J. at 599.
The company also complains that the Board adjusted test year revenues to reflect year end customer levels, the fault cited being that this reflects a departure from the Board's previous practice. However, we find that the reasons given in support of this determination by the Board are sufficiently validated by the expertise of the agency. These are: (1) the growth rate shown in the latter part of the test year was a better indication of what could be expected during the year in which the new rates would be operative than the abnormally slow growth shown in the beginning of the test year, (2) the adjustment is more nearly consistent *80 with the treatment given other utilities and the Board's usual approach of allowing for growth as a known change.
Further, we do not agree that the adjustment reflects a departure from previous decisions. In recommending against the adjustment the hearing examiners misread the intent of the Board as expressed in its opinion in the earlier telephone company case relied on, Docket No. 722-153. It is clear to us that the adjustment was disallowed in that case for the reason that the Board was "satisfied * * * with the normalcy of the test period used in this proceeding." It particularly noted in that decision that it has in the past "adjusted revenues where in our opinion the test year revenues were not representative of normal test year results."
In rejecting the company's requested adjustment of $32,800,000 for cash working capital the Board found that such an allowance had not been justified by the lead-lag study submitted by the Company. Its dissatisfaction with the study lay in the fact that the leads and lags between the payment of expenses and the receipt of revenues should have been consistently treated. Evidence in support thereof is found in the testimony of one witness to the effect that revenue was not regarded as being in the company's possession until checks had actually been cleared, whereas expenses were treated as "paid" on the date the company's check was drawn instead of the date the funds were actually paid out of the company's account.
During the hearings the company presented a plan for directory assistance charging, and its adoption was recommended by the hearing examiners. The Board rejected the proposed plan by reason of certain practical difficulties. The most important of these had to do with achieving a reasonable degree of control over the number of directories to be distributed without charge and in administering a program having so many exceptions from its reach, such as for charitable organizations. From this determination the company appeals.
*81 The Board also decided that the company should initiate "Lifeline Rates," which are special low-use residential rates, as recommended by the hearing examiners. The estimated cost of the program ranges from one-half million dollars to 1.2 million dollars, but this issue was not resolved. Instead, the Board proceeded on its finding that the company had generated a surplus of $374,000 from the rate relief given in September 1975 and that for the time being, at least, these revenues should be applied against the costs of initiating the new program with appropriate adjustments to be made later when actual cost figures become available.
The company objects that the Lifeline Rate plan was adopted without a sufficient record and calls to our attention other cases in which the Board conducted such hearings. In one the Board postponed the decision on the rate issue because the commissioners could not agree on the rate designed to implement the plan.
The company appears to offer no real objection to the plan itself, and we are not disposed to interfere with this exercise of the Board's legislative-regulatory discretion. The issues of expense and rate will be resolved at a later time and expenses in the meantime are being met by surplus earnings.
We further conclude that the Board's determination to disallow the petition for directory assistance charging is supported by substantial credible evidence. Close v. Kordulak Bros., supra at 599.
The company's contention that the Board violated provisions of the Open Public Meetings Act, N.J.S.A. 10:4-6 et seq., is based on the following remarks made by one of the commissioners:
We are three Commissioners on this Commission and we can't talk to each other. I dislike, and I object very much to speaking through interpreters which is in effect what we have to do. And, it just seems to me that this position of requiring multi-member Boards to have their deliberations covered by the Sunshine Law is just arbitrary, unworkable and it certainly isn't in the public interest.
*82 There is little doubt from the excerpt above of the vehement dissatisfaction of the commissioner with the requirements of the Act. However we cannot conclude therefrom that the act was in any respect violated. Taken together with remarks later made in the same opinion, the commissioner implied that notwithstanding the awkward relationship it created among the members of the Board, its requirements were nevertheless observed.
The contention that the Board violated the Administrative Procedure Act, N.J.S.A. 52:14B-1 et seq., is based upon the contents of the following stipulation:
Subsequent to the issuance of the Hearing Examiner's Report and Recommendation in this matter, and after exceptions were filed and served, individual Commissioners conferred with various Board staff members, including the Hearing Examiners presiding. The parties were not noticed of such conferences nor did they participate in them.
In such conferences, where necessary, various staff members, including the Hearing Examiners, were asked to summarize the various issues, the positions of the parties, make reference to the transcript of testimony and exhibits, and to itemize various revenue calculations.
From this the company argues that the Board relied on data and recommendations not of record, in violation of the act. Section 10 thereof expresses the fundamental policy that:

* * * * * * * *
Every party shall have the right to present his case or defense by oral and documentary evidence, to submit rebuttal evidence and to conduct such cross-examination as may be required for a full and true disclosure of the facts. [N.J.S.A. 52:14B-10(a)]
Nowhere does the statute attempt to regulate the working relationship between the agency heads and their subordinates; in fact, the statute specifically recites "the agency's experience, technical competence, and specialized knowledge may be utilized in the evaluation of the evidence." N.J.S.A. 52:14B-10(b).
*83 The company's reliance upon Mazza v. Cavicchia, 15 N.J. 498 (1954), does not persuade us that the facts contained within the stipulation invalidate the agency's action. The misconduct found in Mazza consisted of the Director's use of a "secret report" prepared by a hearer in arriving at his administrative decision. It digested the testimony, the hearer's findings as to facts and law, and contained a recommendation. Crucially important was the fact that it was not furnished to the adversary. Here, complete disclosure was made of all factual findings, conclusions and recommendations arrived at by the hearing examiners. The interaction between the commissioners and the hearing examiners simply formed a part of the agency's reasoning process by which it arrived at what has been well described as its "institutional decision." Davis, Administrative Law Treatise, § 11.01 at 36 (1958).
Finally, the company's argument that the Board erroneously relied upon the rise in stock market prices and published levels of earnings in arriving at their decisions and that such material was outside the record of the case is clearly without merit. R. 2:11-3(e) (1) (E). The Board's action is supported by a "residuum of legal and competent evidence in the record." Weston v. State, 60 N.J. 36, 51 (1972); In re Application of Howard Savings Bank, supra, 143 N.J. Super. at 8-9.
We have noted certain factual errors contained in the Board's decision and order which were called to our attention by the company. These involve inadvertencies in designating financial data and a security rating as those of the company rather than of AT&T, the parent company, and in referring to the company's bonds as "the most solid and least risky utility stock." We have concluded that such errors were harmless and could not have produced an unjust result. R. 1:7-5.
Affirmed.