**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2518-20

IN THE MATTER OF THE
APPLICATION OF PSEG
NUCLEAR, LLC AND EXELON
GENERATION COMPANY,
LLC FOR THE ZERO EMISSION
CERTIFICATE PROGRAM –
SALEM UNIT 1

IN THE MATTER OF THE
APPLICATION OF PSEG
NUCLEAR, LLC AND EXELON
GENERATION COMPANY,
LLC FOR THE ZERO EMISSION
CERTIFICATE PROGRAM –
SALEM UNIT 2

IN THE MATTER OF THE
APPLICATION OF PSEG
NUCLEAR, LLC FOR THE
ZERO EMISSION
CERTIFICATE PROGRAM –
HOPE CREEK

_____

Argued October 31, 2023 – Decided December 4, 2023

Before Judges Rose, Smith and Perez Friscia.

On appeal from the New Jersey Board of Public Utilities, Docket Nos. ER20080557, ER20080558 and ER20080559.

Brian O. Lipman, Director, argued the cause for appellant (New Jersey Division of Rate Counsel, attorneys; Brian O. Lipman, Thomas David Wand and Sarah H. Steindel, on the briefs).

Brandon Cole Simmons, Deputy Attorney General, argued the cause for respondent New Jersey Board of Public Utilities (Matthew J. Platkin, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Brandon Cole Simmons, on the brief).

Matthew E. Price (Jenner & Block, LLP) of the District of Columbia and Massachusetts bars, admitted pro hac vice, argued the cause for respondent Exelon Generation Company, LLC (Day Pitney, LLP, Matthew E. Price and Carrie Hill Allen (Exelon Corporation) of the Maryland and District of Columbia bars, admitted pro hac vice, attorneys; Christopher John Stracco, Matthew E. Price, and Carrie Hill Allen, on the brief).

Aaron I. Karp argued the cause for respondent PSEG Nuclear, LLC (Public Service Enterprise Group Incorporated, attorneys; Aaron I. Karp and Grace H. Park, on the brief).

Jeffrey W. Mayes (Monitoring Analytics, LLC) of the Pennsylvania, Virginia and District of Columbia bars, admitted pro hac vice, argued the cause for intervenor-respondent Monitoring Analytics, LLC (Carlin & Ward, PC and Jeffrey W. Mayes, attorneys; Michael J. Ash and Jeffrey W. Mayes, of counsel and on the brief).

2

Matthew M. Weissman, attorney for respondent Public Service Electric and Gas Company; Phillip J. Passante, attorney for respondent Atlantic City Electric Company (Matthew M. Weissman and Phillip J. Passanante, on the joint brief).

Sills Cummis & Gross, PC, Ellen S. Ginsberg (Nuclear Energy Institute, Inc.) of the New York bar, admitted pro hac vice and Jonathan M. Rund (Nuclear Energy Institute, Inc.) of the Virginia bar, admitted pro hac vice, attorneys for amicus curiae Nuclear Energy Institute, Inc., (Peter G. Verniero and Michael S. Carucci, of counsel and on the brief; Ellen C. Ginsberg, Jonathan M. Rund and Jerry Bonanno, on the brief).

Gibbons PC, and Justin Gundlach (Institute for Policy Integrity, NYU School of Law) of the New York bar, admitted pro hac vice, attorneys for amicus curiae Institute for Policy Integrity at NYU School of Law (Jennifer Ann Hradil and Justin Gundlach, on the brief).

PER CURIAM

This appeal concerns the second round of Zero Emissions Certificates (ZEC) awarded by the Board of Public Utilities (BPU or Board) to three Salem County nuclear power plants pursuant to the ZEC Act, N.J.S.A. 48:3-87.3 to -87.7. Enacted in 2018, the Act permits the State to subsidize nuclear power plants at risk of closure, enabling the State to benefit from the plants' carbon-free energy generation. The subsidies are funded by a per-kilowatt-hour charge paid by New Jersey's energy users. The BPU administers the program and assesses the eligibility of applicant nuclear power plants based on certain

3 <span>A-2518-20</span>

criteria. See N.J.S.A. 48:3-87.5(e). Participants are required to reapply to the program every three years to continue receiving subsidies.

The first round of ZECs were awarded in 2019 to Salem Nuclear Generating Station, Units 1 and 2 (Salem 1 and Salem 2), and Hope Creek Generating Station (Hope Creek) (collectively, Salem County plants). The awards were challenged but affirmed by this court on appeal. In re Implementation of L. 2018, C. 16 Regarding the Establishment of Zero Emission Certificate Program for Eligible Nuclear Power Plants (ZEC I), 467 N.J. Super. 154 (App. Div. 2021).

Unlike the first round, during the second round, the Board was empowered to reduce the value of the subsidies had it been satisfied a reduced payment would not trigger the plant's closure. See N.J.S.A. 48:3-87.5(j)(3)(a). With their applications, the Salem County plants submitted voluminous public and confidential data and projections, describing their environmental impact, revenues, costs, and risks. Each of the three plants also certified they would be forced to cease operations if the subsidies were eliminated or reduced. Following several months of internal analysis; review of written and live testimony; public hearings, including public comments; and submissions from interested parties, the Board determined the Salem County plants satisfied all

statutory criteria and a reduced award would not enable the plants to continue operations. Accordingly, the Board awarded "the maximum amount of ZECs authorized by the Legislature for the second eligibility period."

As they had done in the first round of ZEC proceedings, Division of Rate Counsel (Rate Counsel) participated as of right, see N.J.S.A. 52:27EE-48, and opposed the ZEC awards before the Board. Rate Counsel now appeals from the Board's April 27, 2021 orders awarding second-round ZECs to the Salem County power plants, contending the Board's decision[1] was arbitrary, capricious, and unsupported by the record. Rate Counsel primarily argues the Board: (1) failed to conduct a de novo review of the record, disregarding expert opinion that the three plants miscalculated their revenues, costs, and risks, whereas a correct accounting demonstrated the plants did not need subsidization; and (2) erroneously awarded the maximum $10 per megawatt-hour subsidy when a lesser subsidy was sufficient. Intervenor Monitoring Analytics, LLC, acting in its capacity as the Independent Market Monitor (IMM) for PJM

---

[1] The Board issued separate orders and decisions approving each of three Salem County plant applications. Because the decisions are virtually identical, we refer to them in the singular for ease of reference.

Interconnection,[2] also opposed the Salem County plants' applications before the Board and supports Rate Counsel's argument that we reverse the Board's orders. In its merits brief, IMM argues the Board failed to consider "much of the record," including IMM's report. During oral argument before us, however, both Rate Counsel and IMM argued a remand was necessary for the Board to explain its findings and specify the evidence supporting its conclusions.

The following parties and amici curiae join the Board in urging us to affirm: PSEG Nuclear, LLC (PSEG Nuclear), as the majority owner of Salem 1 and Salem 2, and sole owner of Hope Creek; Exelon Generation Company, LLC, (Exelon), minority owner of Salem 1 and Salem 2 at the time of filing;[3] Public Service Electric and Gas and Atlantic City Electric Company (ACE); and amicus

---

[2] "PJM Interconnection is a regional transmission organization (RTO) that coordinates the movement of wholesale electricity in all or parts of Delaware, Illinois, Indiana, Kentucky, Maryland, Michigan, New Jersey, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia, West Virginia and the District of Columbia." About PJM, PJM, https://www.pjm.com/about-pjm/who-we-are (last visited Nov. 27, 2023).

[3] In February 2022, Exelon's parent company, Exelon Corporation, divested its power generation and competitive energy assets to Constellation Energy Corporation, which is not a party to this appeal.

curiae, Nuclear Energy Institute, Inc.[4]  Amicus curiae Institute for Policy Integrity (IPI) supports neither party.  But IPI contends the benefits of the ZEC program should be evaluated in view of the full amount of carbon emissions avoided both within New Jersey and beyond.  According to IPI, "a global pollutant like carbon does not stay within its geographic borders, but rather mixes in the earth's atmosphere and affects climates worldwide."

Having considered the arguments of the parties and interested groups in view of the record and governing legal principles, we conclude the Board's findings are sufficiently supported by the evidence and consonant with the ZEC Act.  Accordingly, we affirm the orders under review.

I.

We commence our review with a brief history of the ZEC Act and the provisions that are relevant to this appeal.  As we explained in ZEC I:  "The purpose of the ZEC Act is to subsidize nuclear power plants at risk of closure, helping them to remain operational despite competition from other carbon-emitting power sources, in the interest of New Jersey's clean energy goals."  467 N.J. Super. at 160.  "As a subsidy promoting nuclear power, a ZEC is 'a

_____

[4] Four entities appeared before the Board but are not participating in this appeal: New Jersey Large Energy Users Coalition; Rockland Electric Company; Jersey Central Power and Light Company; and PJM Power Providers Group.

certificate, issued by the [B]oard or its designee, representing the fuel diversity, air quality, and other environmental attributes of one megawatt-hour of electricity generated by an eligible nuclear power plant selected by the [B]oard to participate in the program.'" Id. at 162 (alterations in original) (quoting N.J.S.A. 48:3-87.4). If selected, a plant "shall receive a number of ZECs equal to the number of megawatt-hours of electricity that it produced in [an] energy year," N.J.S.A. 48:3-87.5(g)(2), i.e., "the 12-month period from June 1st through May 31st, numbered according to the calendar year in which it ends," N.J.S.A. 48:3-87.4, 48:3-51.

Pursuant to N.J.S.A. 48:3-87.5(e)(1) to (5), a nuclear power plant must satisfy five criteria to be eligible for the ZEC program. In essence, a plant must demonstrate to the Board: (1) it is "licensed to operate by the United States Nuclear Regulatory Commission"; (2) it "makes a significant and material contribution to the air quality in the State by minimizing emissions" and retirement of the plant "would significantly and negatively impact New Jersey's ability to comply with State air emissions reduction requirements"; (3) its "environmental attributes are at risk of loss because the nuclear power plant is projected to not fully cover its costs and risks" and it "will cease operations within three years unless the nuclear power plant experiences a material

financial change"; (4) it "does not receive any direct or indirect payment or credit" for its "environmental attributes that will eliminate the need for the nuclear power plant to retire"; and (5) it has paid the application fee.

Here, as was the case in ZEC I, only the Salem County plants' eligibility under the third criterion is at issue. See 467 N.J. Super. at 163. To demonstrate eligibility under this subsection, applicants must provide

> any financial information requested by the [B]oard pertaining to the nuclear power plant, including, but not limited to, certified cost projections over the next three energy years, including operation and maintenance expenses, fuel expenses, including spent fuel expenses, non-fuel capital expenses, fully allocated overhead costs, the cost of operational risks and market risks that would be avoided by ceasing operations, and any other information, financial or otherwise, to demonstrate that the nuclear power plant's fuel diversity, air quality, and other environmental attributes are at risk of loss because the nuclear power plant is projected to not fully cover its costs and risks, or alternatively is projected to not fully cover its costs and risks including its risk-adjusted cost of capital.

> [N.J.S.A. 48:3-87.5(a).]

For the purpose of such disclosures, "'operational risks' shall include, but need not be limited to, the risk that operating costs will be higher than anticipated because of new regulatory mandates or equipment failures and the risk that per megawatt-hour costs will be higher than anticipated because of a

lower than expected capacity factor." Ibid. "'Market risks' shall include, but need not be limited to, the risk of a forced outage and the associated costs arising from contractual obligations, and the risk that output from the nuclear power plant may not be able to be sold at projected levels." Ibid. Additionally, all applicants must "certif[y] that the nuclear power plant will cease operations within three years unless the nuclear power plant experiences a material financial change." Ibid. The financial information submitted in support of an application is kept confidential, with limited exceptions. Ibid.

The value of ZECs is derived from the Act's requirement that every electric public utility in the state "purchase ZECs . . . from each selected nuclear power plant." N.J.S.A. 48:3-87.5(i)(2); see also N.J.S.A. 48:3-51 (defining "electric public utility"). Each electric public utility is required to purchase a number of ZECs proportionate to that utility's share of the state's total electrical distribution, such that all ZECs are purchased. N.J.S.A. 48:3-87.5(i)(2). The Board is directed to calculate the price per ZEC every energy year. N.J.S.A. 48:3-87.5(i)(1). Presently, the price equates to $10 per megawatt-hour generated by the selected plants, the maximum price permitted under the Act. See N.J.S.A. 48:3-87.5(g)(1) to (2), (i), and (j)(1).

Pertinent to this appeal,

10

to ensure that the ZEC program remains affordable to New Jersey retail distribution customers, the [B]oard may, in its discretion, reduce the per kilowatt-hour charge imposed . . . starting in the second three year eligibility period and for each subsequent three year eligibility period thereafter, provided that the [B]oard determines that a reduced charge will nonetheless be sufficient to achieve the State's air quality and other environmental objectives by preventing the retirement of the nuclear power plants that meet the eligibility criteria.

[N.J.S.A. 48:3-87.5(j)(3)(a).]

The Act finances the electric public utilities' ZEC purchases through "a non-bypassable, irrevocable charge imposed on the electric public utility's retail distribution customers." N.J.S.A. 48:3-87.5(j)(1). Customers are charged $0.004 per kilowatt-hour, which is directed into a "separate, interest-bearing account and . . . used solely to purchase ZECs, and to reimburse the [B]oard." Ibid. Any excess money in that account at the end of each energy year shall be refunded to customers. N.J.S.A. 48:3-87.5(j)(2).

Against that backdrop, we turn to the Board's August 12, 2020 order, which established the procedure for the second round of ZEC applications. As with the first round, applicants were required to provide background concerning their generation units, past and projected future costs, past and projected future revenues and income, operational and market risks, and analysis of cash flow.

Additionally, applicants were required to provide information about the environmental impact of the Units and the potential impact of their deactivation. Successful applicants would be eligible to receive ZECs from June 1, 2022, to May 31, 2025.

In October 2020, the Board received second-round applications from the Salem County plants. In its cover letter accompanying the Hope Creek application, PSEG Nuclear noted "[t]he applications for all three plants are interdependent," and "absent a separate material financial change, the plants will cease operation . . . unless all three plants receive ZECs that adequately compensate the plants for their costs and risks." Although the parties have not provided the complete applications for any of the three plants, in its confidential appellate appendix, PSEG Nuclear submitted an excerpted version of the Hope Creek application. Among other things, this application includes, for all three plants: historical and projected energy capacity and generation; an accounting of costs for the prior ten years and projected costs for the next five years; projected revenues for the next five years; an explanation of the assumptions incorporated in making the revenue projections; and estimated market and operational risks for the upcoming three-year ZEC period, with explanations of the risk calculations and the measures taken to mitigate risk.

12

The Hope Creek application also included a statement of the amount of subsidization required to cover the applicants' costs for each plant in each of the next five years, calculated by both including and excluding risks. When risks were included, each plant was projected to require an average subsidy well exceeding the maximum $10 available.

Discovery ensued. As it did for the first round of applications, the Board again engaged Levitan & Associates, Inc. to assist in evaluating the applications and discovery material. See ZEC I, 467 N.J. Super. at 166. On January 19, 2021, the Board issued letters to the interested parties disclosing its initial evaluation of the three applications based on Levitan's preliminary reports. In essence, Levitan tentatively confirmed all three Salem County plants satisfied four of the five statutory criteria: they were licensed to operate through 2030; the retirement of the plants would increase carbon emissions and decrease air quality; the owner or operators certified the plants did not receive duplicative subsidies; and the necessary fees had been paid. See N.J.S.A. 48:3-87.5(e)(1) to (2), (4) to (5).

Pertinent to this appeal, Levitan identified areas in which the applicants potentially underestimated revenue or overestimated cost under the third criterion – whether the plants were at risk of closing because their costs and

risks outpaced their revenue.  See N.J.S.A. 48:3-87(e)(3).  Levitan's preliminary calculations reflected necessary subsidies well below the $10 available. However, in its January 19, 2021 correspondence, the Board concluded:  "Taken individually, none of these revenue or cost adjustments results in a profitable outcome, i.e., revenues exceeding costs."  Instead, "[t]he combined impact of all these adjustments results in a material financial improvement but does not make [the unit] profitable."

Between January 29, 2021 and February 26, 2021, the parties submitted written testimony followed by written cross-examination of opposing witnesses and written responses.  PSEG Nuclear presented the testimony of:  Carl Fricker, Vice President of Power Operations Support for PSEG Power, LLC, PSEG Nuclear's direct parent company; and Daniel Cregg, Executive Vice President and Chief Financial Officer of PSEG, the parent company of both PSEG Power and PSEG Nuclear.  Rate Counsel provided the testimony of:  Andrea C. Crane, President of The Columbia Group, Inc., a financial consulting firm specializing in utility regulation; and Maximilian Chang, a principal associate with Synapse Energy Economics, Inc., a consulting firm specializing in the electricity industry.  IMM provided an analytic report in lieu of testimony.

In the interim, on February 1, 2021, the Board conducted two back-to-back virtual public hearings.[5] At the first hearing, PSEG Nuclear, Rate Counsel, and IMM offered remarks consistent with their written testimony and submissions. Additional comments were offered by labor organizations, commercial associations, environmental groups, and consultants, among other groups. These speakers primarily emphasized the environmental and economic value of the plants and universally supported awarding ZECs to the Salem County plants.

During the second hearing, however, a representative of the Large Energy Users Coalition urged the Board to refrain from shifting risks from the plants to the ratepayers. Similarly, an AARP representative objected to the award of ZECs, citing the potential hardship to ratepayers and the uncertainty and lack of transparency in the process. The balance of comments, from organizational representatives, consultants, and community members, were similar to those offered in the earlier comment session and largely supportive of the ZEC award.

---

[5] The Board also accepted written comments, which were not provided in the record before us. According to the Board, it received twenty-nine written comments supporting the issuance of ZECs, emphasizing the environmental and economic importance of the plants, and nine opposing comments, arguing the ZECs were an anti-competitive measure, which would place an unfair burden on ratepayers.

On March 8, 2021, the Board conducted a virtual evidentiary hearing. Several witnesses testified, including: Cregg on behalf of PSEG Nuclear; Joseph Bowring on behalf of IMM; Crane and Chang on behalf of Rate Counsel; and Levitan's vice president, Seth Parker, on behalf of the Board. The session included public and confidential testimony.[6]

At some point after the February 1, 2021 hearings, the Board considered the parties' written closing arguments. On March 19, 2021, we issued our decision in ZEC I.

During an April 27, 2021 meeting, the Board unanimously approved all three ZEC applications, awarding the full $10 per megawatt-hour permitted under the Act. That same day, the Board issued its memorializing orders. In its accompanying decision, the Board first detailed the history of the ZEC program, the Salem County plants' applications, and the positions of the parties.

Noting the parties did not dispute that the applicants satisfied the first, fourth, and fifth criteria, N.J.S.A. 48:3-87.5(e)(1), (4) to (5), the Board found the plants met criterion two: the plants materially contributed to meeting New Jersey's air quality and environmental goals, N.J.S.A. 48:3-87.5(e)(2). At issue on this appeal, the Board further found that if the plants closed, existing or soon-

---

[6] The parties provided a public and confidential transcript of the proceedings.

to-be-built green energy stock would be insufficient to fill the gap, leading to increased reliance on fossil fuels under the fifth criterion, N.J.S.A. 48:3-87.5(e)(5).

Addressing the arguments raised by Rate Counsel and the intervenors, the Board first rejected their contentions that the BPU was required to "harmonize the ZEC Act with provisions of [the Electric Discount and Energy Competition Act (EDECA), N.J.S.A. 48:3-49 to -98.5]," which would require that ZECs may not issue if the resulting rates are not "just and reasonable." Noting N.J.S.A. 48:2-2 "generally applies to all rate cases initiated by [the BPU's] own motion, or by complaint, and requires [the BPU] to fix just and reasonable rates," the Board concluded the ZEC Act "contains no mention of just and reasonable rates; instead its focus is on creating a ZEC program[] and setting forth the specific criteria for evaluation of [ZEC] applications." See N.J.S.A. 48:3-87.5(e).

To support its decision, the Board found the EDECA "applies only to entities whose rates are regulated by this Board, not unregulated nuclear merchant generators like applicants." Finding "the statutes serve separate purposes," the Board cited our decision in ZEC I and declined "to harmonize the two statutes." See 467 N.J. Super. at 188 (reiterating "the fact that the acts were not enacted during the same time and make no specific references to each other

further indicates that they were not intended to be read in pari materia") (quoting Richard's Auto City v. Dir., Div. of Tax'n, 140 N.J. 523, 540 (1995)).

Shifting its attention to the financial criteria set forth in N.J.S.A. 48:3-87.5(e)(3), the Board cited the "voluminous financial information" annexed to the Salem County plants' applications; the "comprehensive responses to discovery and data requests"; and the public hearings and testimonial hearings. Citing the "clear text of the statute," the Board rejected the suggestions advocated by Levitan, Rate Counsel, and IMM that market risks and spent fuel costs should be excluded from the applicants' financial need assessment. Instead, the Board found "[t]he Legislature was clear and specific regarding the criteria" for evaluating ZEC applications, noting "N.J.S.A. 48:3-87.5(a) requires the applicants' cost projections to include" in relevant part, "fuel expenses, including spent fuel expenses" and "the costs of operational risks and market risks that would be avoided by ceasing operations."

In its assessment of the applicants' operational and market risks, the Board noted the express terms of N.J.S.A. 48:3-87.5(e)(3) require the applicant to demonstrate "the nuclear power plant is projected to not fully cover its costs and risks." Further, the Act defined risks "to include 'operational risks,' i.e., operating costs higher than anticipated, and 'market risks,' i.e., market energy

18

and capacity price volatility." See N.J.S.A. 48:3-87.5(a). Nonetheless, the Board acknowledged its "authority to determine the weight that should be given to these factors."

The Board noted "the parties disputed both the type of cost and risk that th[e] Board may consider[] and . . . the amount of costs, including the cost of risks, and revenues" that the plants were likely to accrue. Based on its "review of the 'financial and other confidential information' submitted throughout this proceeding," however, the Board was satisfied the financial criterion pursuant to N.J.S.A. 48:3-87.5(e)(3) was met because "the plants [we]re not projected to fully cover their costs and risks."

Empowered under the Act to reduce the amount of the ZEC award if "a reduced charge will nonetheless be sufficient to achieve the State's air quality and other environmental objectives by preventing the retirement of the nuclear power plants that meet the eligibility criteria," N.J.S.A. 48:3-87.5(j)(3)(a), the Board was not persuaded "a reduced ZEC charge w[ould] be 'sufficient' to prevent the retirement of the nuclear plants." The Board thus considered but rejected the focus of the "financial analys[e]s prepared by some parties, Levitan, and [the BPU's] Staff" suggesting "a lesser ZEC charge may provide enough of a market signal to keep the plants in operation." The Board focused instead on

"whether a reduced ZEC charge [wa]s 'sufficient to achieve the State's air quality and other environmental objectives by preventing the retirement of the nuclear power plants.'"  Ibid.

The Board elaborated:

> In coming to a decision, the Board has considered the legitimate policy goals of the State and evaluated foreseen impacts on fuel diversity, fuel security, and compliance with State environmental goals . . . .  If any of the three units were to retire, additional resources would be required to replace their output.  Although solar power in New Jersey could provide some additional supply, it is not yet sufficient to alleviate the loss of baseload from the nuclear units.  Additionally, offshore wind energy in New Jersey is just starting, and while, in the future, it should have the ability to provide significant energy into PJM and the state, the capacity is not currently available.  Thus, if any or all three units close, the replacement power sources would increase carbon and other harmful emissions to the environment, which is in contravention of the State's stated goal of carbon reduction, as well as other pollutants in the state.  With the loss of nuclear energy sources, New Jersey would become reliant on fossil fuel plants to make up for the loss of zero-emission capacity over the next three years.

This appeal followed.

## II.

"Our limited review of an agency decision is well settled." In re Young, 471 N.J. Super. 169, 176 (App. Div. 2022) (citing Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011)); see also Allstars Auto. Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018). An appellate court "will not reverse an agency's decision unless: (1) it was arbitrary, capricious, or unreasonable; (2) it violated express or implied legislative policies; (3) it offended the State or Federal Constitution; or (4) the findings on which it was based were not supported by substantial, credible evidence in the record." Univ. Cottage Club of Princeton N.J. Corp. v. N.J. Dep't of Env't Prot., 191 N.J. 38, 48 (2007); see also N.J.S.A. 48:2-46.

"In assessing those criteria, a court must be mindful of, and deferential to, the agency's 'expertise and superior knowledge of a particular field.'" Circus Liquors, Inc. v. Governing Body of Middletown Twp., 199 N.J. 1, 10 (2009) (quoting Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992)). Thus, "[a] reviewing court 'may not substitute its own judgment for the agency's, even though the court might have reached a different result.'" In re Stallworth, 208 N.J. 182, 194 (2011) (quoting In re Carter, 191 N.J. 474, 483 (2007)).

Our Supreme Court has held that the BPU's "complex valuation formulas and accounting concepts . . . are exactly the type of decisions that our precedents instruct are best left to the agency's expertise." In re PSEG Rate Unbundling, 167 N.J. 377, 392 (2001). However, the agency must "disclose its reasons for any decision, even those based upon expertise, so that a proper, searching, and careful review by th[e] court may be undertaken." Balagun v. Dep't of Corr., 361 N.J. Super. 199, 203 (App. Div. 2003). "[M]ere cataloging of evidence followed by an ultimate conclusion . . . without a reasoned explanation based on specific findings of basic facts" is insufficient. Blackwell v. Dep't of Corr., 348 N.J. Super. 117, 122-23 (App. Div. 2002). Even so, an agency decision "is sufficient if it can be determined from the document without question or doubt what facts and factors led to the ultimate conclusions reached." In re Application of Howard Sav. Inst., 32 N.J. 29, 53 (1960). "All of the evidential data need not be repeated or even summarized, nor need every contention be exhaustively treated." Ibid.

Although "a reviewing court is 'in no way bound by [an] agency's interpretation of a statute or its determination of a strictly legal issue,'" Allstars Auto, 234 N.J. at 158 (quoting Dep't of Child. & Fams. v. T.B., 207 N.J. 294, 302 (2011)), an agency's interpretation of a statute it is charged with

implementing is "entitled to great weight." Nelson v. Bd. of Educ., 148 N.J. 358, 364 (1997). The party challenging the administrative action bears "[t]he burden of demonstrating that the agency's action was arbitrary, capricious[,] or unreasonable." Lavezzi v. State, 219 N.J. 163, 171 (2014) (quoting In re J.S., 431 N.J. Super. 321, 329 (App. Div. 2013)).

## III.

Guided by these legal principles, we first address the sufficiency of the Board's decision. Pursuant to the Act, the Board squarely addressed all five eligibility criteria set forth in N.J.S.A. 48:3-87.5(e)(1) to (5). The Board's analysis was guided by the "policy goals of the State" discussed in the Act. See N.J.S.A. 48:3-87.3. As we explained in ZEC I, the consideration of risks and the price of spent fuel is consonant with these requirements. 467 N.J. Super. at 180-81 (citing N.J.S.A. 48:3-87.5(e)(3)). We also foreclosed the argument that spent fuel costs must not be considered in light of the moratorium on collection. See id. at 171. In his written testimony in the present matter, Cregg explained the applicants need to set aside a provision for spent fuel regardless of whether it was being collected. Accordingly, the agency complied with legislative policy and followed the law. Allstars Auto, 234 N.J. at 157.

The record is replete with data supporting the Board's finding that the Salem County plants were not projected to cover their costs and risks pursuant to the Act's definitions. The applicants submitted and updated a spreadsheet listing their revenues, costs, and risks, demonstrating that without the ZECs, the plants were projected to operate at significant shortfalls. Further, the applicants explained the figures provided.

Regarding revenue, the applicants explained the derivation of their energy revenue projections were a product of "expected PJM locational marginal price." The applicants submitted initial projections based on May 29, 2020 pricing, but updated those projections when new pricing became available on September 30, 2020. Notably, Levitan determined the applicants' pricing and adjustments were "reasonable" and "very close to published (S&P Global Power) forward prices" as well as "reported historical data." The applicants explained capacity revenue is "the product of the quantity of unforced capacity the unit is eligible to sell into the PJM capacity auction, and the forecasted auction price." The applicants calculated this figure with citation to their historical cleared unused capacity and historical prices at PJM base rate auctions.

Moreover, in his March 8, 2021 testimony before the Board, Cregg addressed the applicants' methodology and conclusions in further detail:

24                                                              A-2518-20

[Considering] how the plants would see market revenues on a go-forward basis, I would take that apart into two different pieces. I would take a look at the energy pricing and I would take a look at the capacity pricing.

I would rely upon forward markets, as we have done within our application to derive the energy side, and I would take a look at an anticipated outcome, which has been the subject of some of the information that has been passed back and forth with respect to capacity. 2024, was a particularly low year from the standpoint of spot prices and I believe that number was somewhere around $19 a megawatt hour.

And I think if you look forward within the application, based upon forward prices, you would see something that would be somewhere around $24 or $25. Capacity prices were what they were, I can't speak within this part of the session, I could do so in a confidential session with respect to what it would be at capacity price.

Further, the applicants provided their itemized costs pursuant to the series of categories set forth in the application promulgated by the Board. As reflected in the confidential appendices provided on appeal, the applicants explained their calculations regarding market risk and operational risk. Considered together, the applicants' data showed specific shortfalls for each of the three plants across the three-year ZEC period, resulting in average subsidy needs that exceeded the maximum $10 per megawatt-hour for each plant. Because the applicants' data demonstrated revenues were, self-evidently, not expected to cover costs and

risks, as required under N.J.S.A. 48:3-87.5(e)(3), we reject the contentions raised by Rate Counsel and IMM that the Board failed to explain how it reached its conclusion.

Moreover, Rate Counsel's argument that the Board improperly assessed certain data is unavailing. For example, the suggestion that the Board erred by considering only "'downside' risks" and not "consider[ing] the possibility that revenues could be higher or costs could be lower" defies logic and is contrary to the statutory text. The Act defines risks as "the risk that operating costs will be higher" and "per megawatt-hour costs will be higher" than expected, suggesting that appellant's concept of "upside risk" is not within the meaning of the legislation. N.J.S.A. 48:3-87.5(a). A balancing of conventional risk with offsetting benefits would simply yield a best estimate of the plants' costs and revenues – figures which the applicants must provide. Accordingly, risks would be removed from the plain meaning of the ZEC Act, which we have recognized is "contrary to established principles of statutory construction." ZEC I, 467 N.J. Super. at 180.

Although Rate Counsel's alternative methodology might be reasonable, and the Board could have easily adopted its formulas, these sort of "complex valuation formulas and accounting concepts . . . are exactly the type of decisions

that our precedents instruct are best left to the agency's expertise." In re PSEG Unbundling, 167 N.J. at 392. To the extent that the Board did not explain its rejection of Rate Counsel's individual points in detail, the grounds for its decision are readily "determined from the document without question or doubt," eliminating the need for "every contention [to] be exhaustively treated." In re Application of Howard Sav. Inst., 32 N.J. at 53; see also N.J. Bell Tel. Co. v. State, 162 N.J. Super. 60, 77 (App. Div. 1978) (holding that the Board need not "discuss each of the evidentiary items analysed").

In the present matter, the Board sufficiently "set forth basic findings of fact supported by the evidence and supporting the ultimate conclusions" that the plants are ZEC-eligible, as required. See Riverside Gen. Hosp. v. N.J. Hosp. Rate Setting Comm'n, 98 N.J. 458, 468 (1985). We therefore conclude the Board's findings are supported by "substantial evidence" in the record. See Allstars Auto, 234 N.J. at 157; see also R. 2:11-3(e)(1)(D).

Little need be said regarding the challenges to the Board's decision not to award the below-maximum ZECs. Citing N.J.S.A. 48:2-21(b), Rate Counsel argues "[t]he Board has long had an obligation to ensure that any rates it sets are just and reasonable." We rejected Rate Counsel's similar argument in ZEC I, and its reprised contention thus is barred under the principle of stare decisis.

27

See 467 N.J. Super. at 184-88; see also Luchejko v. City of Hoboken, 207 N.J. 191, 208-09 (2011).

Rate Counsel contends our decision in ZEC I does not govern this issue because that case "was decided in the context of the first ZEC proceeding, where the [c]ourt found the Board had no authority to alter the $0.004 per kilowatt hour ZEC charge during the first ZEC eligibility period." We disagree. We held the ZEC Act did not empower the Board to reduce the ZEC charge during the first three-year cycle. ZEC I, 467 N.J. Super. at 185-87. Conversely, N.J.S.A. 48:2-2(b) applies to "rate hearings involving public utilities either initiated on the Board's own motion or by complaint." Id. at 187. We conclude our statutory analysis is equally applicable to the present proceedings because neither the first round nor second round applications constituted rate hearings.

To the extent we have not addressed a particular argument, it is because either our disposition makes it unnecessary, or the argument was without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2518-20