**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0425-22

IN THE MATTER OF THE
SUSPENSION OR REVOCATION
OF THE LICENSE OF LOUIS
QUARTARARO, M.D. LICENSE
NO. 25MA07137700 TO
PRACTICE MEDICINE AND
SURGERY IN THE STATE OF
NEW JERSEY.

_____

Argued April 17, 2024 – Decided October 31, 2024

Before Judges Vernoia, Gummer, and Walcott-Henderson.

On appeal from the New Jersey State Board of Medical Examiners, Division of Consumer Affairs, Department of Law and Public Safety.

Keith J. Roberts argued the cause for appellant Louis Quartararo, M.D. (Brach Eichler LLC, attorneys; Keith J. Roberts and Shannon Carroll, of counsel and on the briefs).

David Puteska, Deputy Attorney General, argued the cause for respondent New Jersey Board of Medical Examiners (Matthew J. Platkin, Attorney General, attorney; Sara M. Gregory, Assistant Attorney General,

of counsel; Kathy Stroh Mendoza, Deputy Attorney General, on the brief).

The opinion of the court was delivered by

WALCOTT-HENDERSON, J.S.C. (temporarily assigned).

Louis Quartararo appeals from an August 22, 2022 final agency decision of the State Board of Medical Examiners (Board), revoking his license to practice medicine and surgery in New Jersey and barring him from seeking reinstatement of his license for at least seven years for: professional misconduct in violation of N.J.S.A. 45:1-21(e) by engaging in sexual contact with patients; negligent acts in violation of N.J.S.A. 45:1-21(d) by performing surgeries with co-surgeons who lacked the requisite privileges; and acts of fraud, deception and misrepresentation in violation of N.J.S.A. 45:1-21(b) by miscoding procedures on patient operative reports and listing procedures in the reports he had not performed for the purpose of ensuring insurance coverage. Quartararo also appeals from the financial penalties and attorney's fees imposed by the Board. Because we conclude the Board's decision was amply supported by credible evidence in the record, we affirm.

I.

Quartararo was a physician and Board-certified orthopedic surgeon licensed to practice medicine in New Jersey. Quartararo practiced at the New

2

Jersey Spine Institute, LLC, the New Century Spine and Outpatient Surgical Center (New Century), and the International Center for Minimally Invasive Spine Surgery (ICMISS), where he was also a fifty-one percent co-owner and Medical Director.

On May 23, 2018, Quartararo appeared before the Board to discuss the results of an inspection of ICMISS that was conducted by the New Jersey Division of Consumer Affairs Enforcement Bureau (Bureau). The Bureau had received a report from the New Jersey Department of Health alleging deficiencies in the care and treatment of Quartararo's patients. Around this same time, the Board also had received additional complaints alleging that Quartararo had engaged in intimate sexual relationships with two patients, Y.R. and K.D.[1]

As part of its investigation into the allegations of sexual misconduct, the Board interviewed Y.R. and K.D. In Y.R.'s interview, she stated that she first saw Quartararo as a patient in 2011 for neck pain following a car accident and that he treated her from 2011 to 2016, performing at least three cervical fusions amongst other procedures. She described Quartararo as "flirtatious" and that he would take her hand during medical appointments "as if to comfort her and then

---

[1] We use initials to protect the confidentiality of the victims pursuant to Rules 1:38-3(a)(2) and 1:38-3(c)(12).

end each visit with a hug." In April 2014, when Y.R. went to his office for follow-up x-rays, she discussed her need for Social Security Disability due to the effects of the multiple surgeries she had undergone, as well as the symptoms of depression she was experiencing. Quartararo told Y.R. that he could help her and, at the end of that visit, she went to give him a hug and kiss on the cheek and he turned his head so that they kissed on the mouth. Y.R. told Board investigators that the contact—the kiss—made her "angry and confused."

Months later, however, Y.R. returned to Quartararo's office for a check-up and left a thank-you note for him with his staff in which she noted that she thought there was chemistry between them and invited him to call or text her at any time.

Over the next two years, Quartararo and Y.R. engaged in a "relationship" which consisted of kissing, groping and petting twice in his office and once in his car, and multiple phone calls and sexually explicit text messages that were exchanged between the two of them. Y.R. denied ever having sexual intercourse with Quartararo and told Board investigators that he had told her he could not have sex with her because he would lose his license. Quartararo not only admitted to the sexual relationship with Y.R., but he also disclosed to Board

4

investigators that he knew Y.R. had a history of depression and that she was taking Zoloft, although he denied knowing the extent of her depression.

The Board's investigation continued into Quartararo's sexual relationship with K.D., on whom Quartararo had performed a cervical fusion on August 25, 2017. According to K.D., she and Quartararo had a sexual relationship that began when Quartararo texted her and asked her out in 2017. The relationship progressed quickly and lasted for approximately one year and included multiple sexual encounters in and out of Quartararo's medical office and at his home. K.D. also revealed to Board investigators that during the time she dated Quartararo, she was "undergoing pain management and [her] emotional state was low[.]"

Throughout the relationship, Quartararo sent K.D. money for shopping and trips. At some point during the relationship, Quartararo asked K.D. to sign statements: (1) stating that their relationship began before she became his patient—two years earlier than it actually began; and (2) agreeing that she would not sue him or report him to the Board. K.D. told investigators that she was on Percocet when she signed the statements.

According to K.D., she started seeing a social worker for counseling because of the stress she felt from her relationship with Quartararo and her concerns about

5

his controlling behavior. K.D. also reported to Board investigators that Quartararo had given her Valium and Focalin during their relationship whenever she spent the night at his house.

Quartararo and K.D.'s relationship ended in July 2018 and, within that same month, K.D. emailed a complaint about Quartararo to the Board. Approximately one week before K.D. was scheduled to meet with Board investigators, Quartararo gave K.D. $20,916, which K.D. told an investigator was "for school." Later, Quartararo's attorney offered her more money to retract the statement she had made to the Board about her relationship with Quartararo. In August 2019, K.D. advised Board investigators that she had applied for a restraining order against Quartararo because he had sent two men to question her neighbors about her, called her "angry and yelling," told her that he had hired a private investigator to watch her, and threatened that if she did not shut up, "he would make sure she was shut up for good."

Following the investigation into Y.R.'s and K.D.'s complaints, the Board offered and Quartararo accepted an Interim Consent Order of Voluntary Surrender to be Deemed a Temporary Suspension of his license to practice medicine and surgery, which was filed on March 22, 2019, and made effective

April 5, 2019.[2] Under the consent order, Quartararo agreed to undergo a psychosexual evaluation and treatment and not practice medicine or surgery until further order of the Board. The consent order did not include a specific license reinstatement date.

Quartararo sought intensive treatment at a residential treatment facility for trauma and later out-patient therapy with Leigh Kolodny-Kraft, a therapist specializing in love and sex addiction. Kolodny-Kraft referred Quartararo to another treatment center for people with trauma issues in December 2019, where he reportedly focused on "boundary violations." Kolodny-Kraft also had Quartararo evaluated by Psychological Counseling Services (PCS) in Arizona for two weeks, where he was nominated to participate in a leadership group for "intensive process work." Quartararo also took a twelve-week course on ethics in the medical practice.[3] Throughout this time, Quartararo continued regular weekly therapy appointments with Kolodny-Kraft.

---

[2] The consent order was made effective on April 5, 2019, to accommodate a "wind-down" period of Quartararo's medical and surgical practice and to permit him to perform surgeries scheduled to occur before April 5, 2019.

[3] According to Quartararo, this course is conducted by Professional Boundaries Incorporated and utilized by New York and New Jersey as a certified course for medical professionals through the American Foundation for Addiction Research.

A-0425-22

Approximately two years later, on May 5, 2021, Quartararo petitioned the Board for reinstatement of his medical and surgical license.[4] Following the petition, on May 27, 2021, the Board filed an order to show cause and a seven-count complaint against Quartararo, alleging, in the section titled "General Allegations," that Quartararo maintained general orthopedic surgery privileges, as well as privileges to perform laminectomies, disc replacements, spinal fusions, spinal decompressions, and injections at ICMISS, but he had performed surgeries at ICMISS with co-surgeons Drs. Ningning He and Thomas Ragukonis, who did not have appropriate surgical privileges to perform these procedures at ICMISS.

The complaint further alleged that Quartararo's performance of his medical duties for patients E.S. (count one), D.C. (count two), Y.O. (count three), L.V. (count four), and D.E. (count five) failed to meet the appropriate standard of care. As to each of these five-named patients—the complaint further alleged that Quartararo used and employed fraud, deception, and misrepresentation, contrary to N.J.S.A. 45:1-21(b); engaged in gross negligence that endangered the life, health, safety

---

[4] Prior to the formal petition, Quartararo's counsel had submitted a March 4, 2020 letter to the Board requesting an opportunity for Quartararo "to appear before a Committee in order that the Board can make an in person assessment" of him and his efforts at rehabilitation.

and welfare of each of them, contrary to N.J.S.A. 45:1-21(c); engaged in repeated acts of negligence, malpractice or incompetence, contrary to N.J.S.A. 45:1-21(d) as the each of them; and engaged in professional misconduct, contrary to N.J.S.A. 45:1-21(e).

Additionally, the complaint alleged that Quartararo's impermissible sexual relationships with Y.R. (count six) and K.D. (count seven) constituted gross and/or repeated malpractice in violation of N.J.S.A. 45:1-21(c) and (d); professional misconduct in violation of N.J.S.A. 45:1-21(e); a failure to comply with regulations administered by the Board in violation of N.J.S.A. 45:1-21(h) (specifically, engaging in sexual misconduct with a patient in violation of N.J.A.C. 13:35-6.3); and the failure to be of good moral character as required for licensing as a physician under N.J.S.A. 45:9-6. The Board sought the temporary suspension of Quartararo's license to practice medicine and surgery.

On June 23, 2021, the Board amended its complaint to add an eighth count, which mirrored the allegations concerning Quartararo's conduct as to the patients identified in counts one through five but alleged Quartararo had directed the conduct to an additional patient, V.C. The amended complaint is the operative complaint for purposes of this appeal. The amended complaint further alleges that Quartararo's interactions with E.S. (count one), D.C. (count two), Y.O.

(count three), L.V. (count four), D.E. (count five), and V.C. (count eight), though not involving sexual contact, nevertheless demonstrated his failure to be of good moral character as required for licensing as a physician pursuant to N.J.S.A. 45:9-6.

The amended complaint sought an order:  (1) temporarily suspending Quartararo's license to practice medicine pending the conclusion of a plenary hearing on the allegations; (2) suspending or revoking Quartararo's license; (3) assessing civil penalties against Quartararo for each separate unlawful act alleged; and (4) requiring Quartararo to pay investigative costs, attorney's fees and costs, witness fees and costs, and trial and transcript costs.

In his answer to the amended complaint, Quartararo denied all allegations related to the quality-of-care, fraud, and misconduct violations contained in counts one through five and eight, involving E.S., D.C., Y.O., L.V., D.E., and V.C. Quartararo, however, admitted to the sexual-misconduct allegations involving Y.R. and K.D.

On July 14, 2021, the Board and Quartararo executed another interim consent order, maintaining the temporary suspension of Quartararo's license pending final disposition of the amended complaint.  Thereafter, the matter was

transmitted to the Office of Administrative Law (OAL) for a hearing as a contested matter.

The OAL Hearing

An administrative law judge (ALJ) held hearings over nine non-consecutive days, from September 10, 2021, through January 14, 2022. Because Quartararo stipulated to facts underlying the sexual-misconduct allegations contained in counts six and seven of the amended complaint as to Y.R. and K.D., the testimony was mostly focused on the "quality-of-care" allegations involving E.S., D.C., Y.O., L.V., D.E., and V.C.

The Board presented its expert witness, Nomaan Ashraf, M.D., M.B.A., an orthopedic spine surgeon, who testified regarding the surgical procedures performed by Quartararo and his co-surgeons. In addition to testifying on his own behalf, Quartararo also presented: Randy Davis, M.D., an orthopedic spine surgeon; Eugene Koh, M.D., an orthopedic spine surgeon and Associate Professor at the University of Maryland; John Athas, M.D., a neuroradiologist; Dr. Patrick J. Carnes, Quartararo's mentor and psychologist; and Kolodny-Kraft, his therapist. Dr. Carnes and Kolodny-Kraft testified about Quartararo's efforts at rehabilitation.

The ALJ qualified Dr. Ashraf as an expert in the field of orthopedic spine surgery.[5]  Dr. Ashraf testified that based on his review of patient records, including pre- and post-operative magnetic resonance images (MRIs), Quartararo along with his co-surgeons performed unnecessary spinal surgeries on each of the six former patients named in the amended complaint.  He also described the various surgical procedures performed by Quartararo with the aid of operative reports and video evidence of the surgical procedures.  Dr. Ashraf defined the relevant medical terms used in the medical reports to describe the procedures performed by Quartararo, stating "[a]nything with ectomy means you're taking it out," referring to procedures like laminectomies and discectomies.  Dr. Ashraf testified that a disc herniation occurs "when a piece of disc is moved out of place and pinching a nerve" and stated "where the disc is what's causing the problem, you perform a discectomy" to remove the part of the spinal disc that is causing pain.  He further stated, "[i]f there's extra bone on the lamina and it's pinching the nerve, you do a laminotomy or a laminectomy. . . .  And, when this part of the joint that's inside the spinal canal is pinching the nerves, you take away that portion of the bone and that's called a

---

[5]  Quartararo did not object to Dr. Ashraf's qualifications as an expert in orthopedic spine surgery but objected to him opining on "endoscopic spine" surgery because Dr. Ashraf did not perform endoscopic surgeries.  The ALJ ruled that Dr. Ashraf was qualified to testify as an expert in spinal surgery.

A-0425-22

facetectomy."  He defined "stenosis" as narrowing in the spinal canal, which is treated with a foraminotomy.[6]  He also defined an endoscopic surgical procedure as one done completely through a tube with the aid of a camera by "looking at the screen to do the operation . . . not using your eyeball."

Dr. Ashraf addressed Quartararo's treatment of patient Y.O., a thirty-year old victim of a motor-vehicle accident on whom Quartararo performed surgery. According to Dr. Ashraf, Y.O.'s medical records, including pre- and post-surgery MRIs, revealed that the surgical procedures Quartararo performed were not medically necessary as there was "no evidence of annular tear, disc herniation, spinal stenosis or significant neuroforaminal narrowing . . . the disc [was] completely normal."  Yet, Quartararo performed surgery consisting of "bilateral lumbar laminotomy, foraminotomy, facetectomy with decompression of the nerve roots of L5 and S1," which was done on the left and the right side of the spine, a discectomy of L5-S1, an ablation of the medial branch nerve, annuloplasty and injection in the

---

[6]  A foraminotomy is a surgical procedure that widens the opening in the spine where nerve roots exit the spinal canal and relieves pressure on the nerves. Foraminotomy, JOHNS HOPKINS MEDICINE, https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/foraminotomy (last visited Oct. 24, 2024).

A-0425-22

right hip.[7]  In reviewing the description of Quartararo's procedure on Y.O.'s spine, Dr. Ashraf testified that the procedure involved the removal of bone on both sides of her spine.  He further stated, "[t]here's no disc herniation, so you don't need a discectomy . . . no stenosis so you don't need a foraminotomy, you don't need a laminotomy.  You don't need a facetectomy."  Dr. Ashraf concluded that Quartararo's surgery on Y.O.'s completely normal spine "is gross negligence."

As to patient, V.C., a male in his late fifties with a disc herniation on the right side that had resulted in stenosis, Dr. Ashraf testified that Quartararo and co-surgeon, Dr. He, performed unnecessary bilateral surgery.  He opined that a right-sided discectomy was the appropriate surgical procedure to address V.C.'s disc herniation, which was on the right side, although other aspects of the surgical procedure were clinically relevant.  He also testified to inconsistencies between V.C.'s operative report, which described using direct visualization, and the intraoperative images, which showed endoscopic surgery.  He found this was not possible, stating "[y]ou cannot do an open procedure through an endoscope . . . they are not compatible with

---

[7] The vertebrae of the spine are numbered and divided into regions:  cervical, thoracic, lumbar, sacrum, and coccyx.  Therefore, L5-S1 refers to a part of the area of the spine where the fifth vertebrae of the lumbar spine (L5) and the first vertebrae of the sacral spine (S1) meet in the lower back, also known as the lumbosacral joint.  Spine Structure and Function, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/body/10040-spine-structure-and-function (last visited Oct. 24, 2024).

A-0425-22

each other." Dr. Ashraf concluded that based on V.C.'s post-operative MRI, there was no lumbar laminotomy, partial foraminotomy or partial facetectomy on the right or left side at the levels of the spine as described in Quartararo's surgical report and, further, "there [had] been no change in the appearance of the disc herniations at L2-3 . . . indicating that the manner of performing the discectomy [was] ineffective in addressing the surgical pathology." Dr. Ashraf concluded that the post-surgical radiology report did not mention a single change to V.C.'s spinal pathology and noted that the post-surgical results therefore showed that Quartararo's surgery did not meet the standard of care.

Dr. Ashraf testified that patients D.E. and L.V. had small disc herniations without evidence of compression on the nerve and opined that bilateral surgery was unnecessary in both cases. Dr. He was Quartararo's co-surgeon in both of these surgeries. Dr. Ashraf made similar findings with respect to D.C., who was diagnosed with a disc herniation and narrowing around the nerve root and whose surgery was performed by Quartararo and Dr. Ragukonis.[8] Dr. Ashraf concluded that there was no evidence of spinal abnormality to indicate that surgery was necessary and that Quartararo performed surgery despite the absence of any symptoms on the right leg

---

[8] Dr. Thomas Ragukonis is a pain management physician who directed D.C. to Quartararo for spinal surgery after non-invasive treatment proved unsuccessful.

A-0425-22

as D.C. complained of pain only in the left leg. Further, he testified that D.C.'s MRI did not support the need for bilateral procedures, and D.C. complained of worsening pain and weakness following surgery, ultimately requiring additional surgery.

Dr. Ashraf did not testify about patient E.S. specifically. Quartararo's testimony reveals that E.S. was a thirty-nine-year-old male with a history of low back and left leg pain. Quartararo found that E.S. had three "bad discs," bilateral stenosis, facet problems, and muscle weakness. As a result, Quartararo performed an endoscopic discectomy and annuloplasty, a facetectomy, a foraminotomy, and a rhizotomy on E.S. Quartararo entered a video into evidence to demonstrate how a bilateral endoscopic procedure is performed, and, on cross-examination, Dr. Ashraf testified he did not see in the video the machinery that would be necessary to perform bilateral surgeries.

According to Dr. Ashraf, after reviewing the post-op MRIs, all the surgical procedures at issue were performed using minimally invasive techniques such as endoscopic surgery. However, Quartararo wrote in the patients' operative reports that the surgeries were completed using a combination of both traditional "open" surgical procedures and endoscopic techniques. Dr. Ashraf testified that the medical evidence shows Quartararo performed only the minimally invasive endoscopic procedures and did not perform the open procedures shown on the

16

operative reports. When asked what the advantage is of operating partially with endoscopic surgery and partially with open tubular surgery, as Quartararo had allegedly done according to his reports, Dr. Ashraf stated that "[i]t makes no sense. Nobody does a partially open procedure and a partially endoscopic procedure. There's no logic to doing something like that, and that post-op MRI shows that it was not done."

Regarding the fraud claims alleging that Quartararo had failed to properly code surgical procedures that he performed on E.S., D.C., Y.O., L.V., D.E., and V.C., Dr. Ashraf testified that the "whole function" of the "operations" section on the first page of the operative report was to list the procedures that were performed during the operation. And, he testified that, despite "laminotomy" appearing on the first page of V.C.'s and D.C.'s reports, their post-surgery MRIs revealed that laminotomies had not been performed.

Quartararo admitted that he had not performed laminotomies on E.S., D.C., Y.O., L.V., D.E., or V.C., despite listing the procedure on the first page of their operative reports. He stated the purpose of the "operations" section on the first page was to put in the "coding descriptors of what we've done," but despite his admission that he had not performed the laminotomies, he explained he had used the coding descriptor for laminotomy because "if you don't write the code like that, it ends

17

up getting flagged and then the billing department has a problem getting paid." He also contended that he had relied upon a coding expert and was advised "the full code description was needed for reimbursement, not a partial description which would require deletion of the wor[d] laminotomy."

Having stipulated to the sexual relationships with his former patients Y.R. and K.D., Quartararo characterized the relationships as "boundary violations." He described his relationship with Y.R. as a "texting relationship" but admitted holding hands with and hugging her during their 2011-2013 office visits and claimed she had misinterpreted that physical contact. He explained that if his patients were "having difficult times" he would sometimes hold their hands and that he gave everyone a hug at the end of the visit, male or female.

Quartararo described his relationship with K.D. differently, however, admitting that he was "looking for love." He expressed remorse over his pursuit of the relationship, stating, "I should not have—this boundary was mine to cross and I crossed it. And for that I am very—I am very sorry." When asked on direct examination what assurances he could give that he would maintain "the proper ethics and professionalism and boundary" required were he to return to the practice of medicine, he responded:

> Well, again, I understand what happenings in my life
> led to this—led to this, you know, misunderstanding

of—of how love works, really. And I think now I am capable of having a healthy relationship, which is something I—which is something I haven't had my whole life. These are things that I—so I definitely understand now. And there are, you know, very—there are very simple protocols to follow. I mean, if someone—if a patient expresses any type of interest, there are conversations that have to be had about—you know, about the confusion of, like, love and, like, gratitude. How—you know, this is—this is something that I know I will not ever entertain in my mind ever again.

Quartararo admitted that during the week prior to K.D.'s scheduled meeting with Board investigators, he paid her $20,916 for the purpose of obtaining her agreement not to report him to the Board. He maintained that K.D. had initiated the transaction.

He also testified that he had spent much of the prior three-and-a-half years putting work and time into examining himself to figure out "why this happened and figure out how this happened and be able to . . . understand it so [he could] take steps to correct it." He further testified that he got "a lot out of" treatment, including a "deeper understanding of what was wrong with [him]" and "developed a lot of resources" and coping skills in his many weeks of treatment at various treatment centers where he participated in individual and group therapy sessions, including with Kolodny-Kraft, and worked on what he characterized as "trauma issues." He

19

acknowledged that he remained in ongoing treatment with Kolodny-Kraft for two hours a week and expressed his intention to continue therapy with her.

Quartararo stated that he was "not trying to make excuses" for his behavior, which he claimed had been triggered by his divorce. He "had practiced for almost twenty years without incidents." His "contentious" divorce and "history of trauma" and abuse brought "deep-seated [sic] issues" to the surface and he had difficulty coping with the idea that he was alone.

Quartararo admitted that Dr. He did not have the requisite privileges when he acted as co-surgeon in surgeries for V.C. and E.S. Dr. Ragukonis acted as Quartararo's co-surgeon for D.C.'s surgery and, when asked at the hearing before the ALJ to confirm that Dr. Ragukonis had hospital privileges at the time of D.C.'s surgery, Quartararo testified that he could not remember whether Dr. Ragukonis had the requisite privileges.

At the hearing, Quartararo also presented his treating therapist, Kolodny-Kraft, who testified about his therapeutic and rehabilitation efforts. Kolodny-Kraft diagnosed Quartararo as a love addict, not a sex addict. She testified that she began treating Quartararo in June 2019, and at that time, they met for four hours a week until around 2021, when they reduced their sessions to two hours a week. Kolodny-Kraft also testified that therapy enabled Quartararo to look deeply into what he was

feeling and why and to learn how to handle triggers when they arose. She testified that his condition was triggered by the abuse he suffered in his marriage, which led him to seek attention elsewhere. Kolodny-Kraft further stated that Quartararo's condition was "situational versus something that [was] going to follow him for life." She further testified that Quartararo did not have any predatory traits and would not be a threat to patients and opined that Quartararo was "definitely rehabilitated" because he "has moved past the shame" and self-disgust for his actions and blaming others, to accepting responsibility for his actions. According to Kolodny-Kraft, Quartararo could safely interact with patients again if he returned to practice with a chaperone present and she explained that the use of a chaperone was "standard protocol," similar to requiring drug screens for someone with a substance-abuse issue. She emphasized her efforts to avoid any bias in favor of Quartararo by sending him for other treatments, including at a "Betrayal Bond" workshop and PCS. She also asked PCS to provide an independent evaluation of Quartararo.

Quartararo also called his psychologist, Dr. Carnes, to testify to his rehabilitation efforts. Dr. Carnes' testimony mostly centered around a two-page supplemental letter he sent to Quartararo's counsel in support of Quartararo's reinstatement. Before the ALJ, Dr. Carnes acknowledged that "[Quartararo's] judgment really was impaired when it came to his sexual behavior . . . ." He

21

described Quartararo, post-treatment, as "a man who really [] sees the pain that he's caused himself and others and I think is a very different man today."

Quartararo also presented expert witnesses, Drs. Davis and Koh, both of whom the ALJ qualified as experts in the field of orthopedic spine surgery. Dr. Davis and Dr. Koh underscored that the standard of care in medicine was "not one specific thing, [but] a spectrum" and it was not unusual for spine surgeons to disagree about which techniques were to be employed in any given case. Throughout Dr. Koh's testimony, he reiterated that Dr. Ashraf's opinion should be considered in the context of his surgical practice and that his practice differed considerably from Quartararo's.

Dr. Athas did not agree with Dr. Ashraf's conclusion that D.C.'s post-surgical MRI results proved that Quartararo had not performed the surgery he claimed to have performed on D.C. Dr. Ashraf based his conclusion on a comparison of D.C.'s pre- and post-surgical MRIs; however, Dr. Athas reviewed the surgical MRIs using contrast and opined that Quartararo had performed the correct surgical procedure, which would be very difficult to perceive on an MRI without using contrast. Dr. Athas emphasized the importance of reviewing the MRIs with contrast to confirm the foraminotomy procedure was in fact performed on D.C. He demonstrated to the ALJ how a comparison of D.C.'s pre-contrast MRI and post-contrast MRI showed that a foraminotomy had been performed.

A-0425-22

The ALJ's Decision

The ALJ issued a comprehensive seventy-nine-page decision and concluded that Quartararo's license to practice medicine and surgery should be suspended for five years retroactive to the date that he temporarily surrendered his license in April 2019. Addressing the sexual-misconduct claims—count six as to Y.R. and count seven as to K.D.—the ALJ reviewed the stipulated facts concerning Quartararo's admitted sexual misconduct and concluded that "Quartararo violated N.J.A.C. 13:35-6.3 by engaging in sexual contact with patients, seeking sexual contact with a patient, and having discussions of an intimate nature with Y.R. and K.D."

Additionally, the ALJ determined Quartararo had "engaged in gross malpractice, professional misconduct, failure to comply with regulations administered by the Board, and failure to be of good moral character, in violation of N.J.S.A. 45:1-21(b),(c), (d), (e), and (h) and N.J.S.A. 45:9-6 . . . ." In reaching this decision, the ALJ found persuasive Kolodny-Kraft's efforts to avoid any claimed bias on her behalf by sending Quartararo for separate treatment at a "Betrayal Bond workshop" and the fact that Dr. Carnes observed and interacted with Quartararo for an estimated eight-to-ten hours per week and twenty-hours on the weekends for three years.

As to the quality-of-care violations concerning E.S. (count one), D.C. (count two), Y.O. (count three), L.V. (count four), D.E. (count five), and V.C. (count eight), the ALJ concluded that each of the surgeries performed by Quartararo met the standard of care, resulting in the dismissal of the following claims in counts three, four and five for failure to meet the appropriate standard of care: gross negligence that endangered the life, health, safety and welfare, contrary to N.J.S.A. 45:1-21(c); repeated acts of negligence, malpractice or incompetence, contrary to N.J.S.A. 45:1-21(d); and professional misconduct, contrary to N.J.S.A. 45:1-21(e).

As to the fraud violations, the ALJ accepted Quartararo's reasoning that he had listed laminotomy on the operative reports of the six surgical patients because the procedures he performed did not have a separate billing code and are included in the code for laminotomies. Thus, the ALJ dismissed the claims of use and employment of fraud, deception, and misrepresentation, contrary to N.J.S.A. 45:1-21(b), in counts one through five and eight.

However, as to the remaining claims in counts one, two, and eight, the ALJ concluded that Quartararo had acted negligently when he performed surgeries with Drs. He and Ragukonis because Dr. He did not have the requisite privileges at ICMISS when he acted as co-surgeon in V.C.'s and E.S.'s surgeries,

and Dr. Ragukonis did not have orthopedic privileges at ICMISS when he acted as co-surgeon in D.C.'s surgery. The ALJ concluded that Quartararo's use of non-privileged co-surgeons for these surgeries constituted gross negligence that endangered the life, health, safety and welfare of his patients, contrary to N.J.S.A. 45:1-21(c); and repeated acts of negligence in violation of N.J.S.A. 45:1-21(d), thus sustaining those claims in counts one, two, and eight.

The ALJ found Quartararo and his expert witnesses—Kolodny-Kraft, and Drs. Athas, Koh, and Carnes credible. She found their testimony "truthful and concise" and that it provided a "clear description of the tests and procedures that were done."

The ALJ did not find credible Dr. Ashraf's testimony it would be impossible for a surgeon and co-surgeon to do a simultaneous surgery. In making this finding, the ALJ considered the video evidence Quartararo provided as an exhibit showing it was indeed possible for two doctors to perform surgery simultaneously. She also concluded Dr. Ashraf's testimony that Quartararo had performed unnecessary surgery on Y.O. was not credible, because Dr. Ashraf admitted he did not review Y.O.'s MRI, and he incorrectly interpreted V.C's. and D.C.'s electromyographs (EMGs), among other noted deficiencies.

25

Both parties submitted written exceptions and participated in oral arguments and a two-day testimonial hearing during which the Board heard additional testimony from Quartararo and his therapist. Kolodny-Kraft testified that Quartararo could safely interact with patients if he returned to work with a chaperone.

Quartararo argued that Dr. Ragukonis' purported lack of credentials had not been pleaded in the complaint and, therefore, he did not have an opportunity to properly address that issue at the hearing. He further argued that because the Board had failed to plead this issue, the ALJ should not have considered it.

The Attorney General urged the Board to adopt the ALJ's findings and legal conclusions regarding the sexual-misconduct allegations but not as to the quality of care provided to E.S., D.C., Y.O., L.V., D.E., and V.C. The Attorney General also requested that the Board use its medical expertise to modify the ALJ's findings and to determine that Quartararo had failed to meet the standard of care required under the law as to E.S., D.C., Y.O., L.V., D.E., and V.C. More particularly, the Attorney General argued that the ALJ had failed to properly evaluate the evidence concerning the need for surgery as to each of the individual patients and in so doing did not consider that: bilateral surgery was not warranted in patients E.S. and D.C. because their medical issues did not

include complaints of bilateral pain and the MRI results did not support the need for bilateral procedures; two of the surgeries listed in the operative reports were never actually performed; some patient outcomes were not as expected; and the surgeries did not meet the standard of care—specifically referring to D.C., who had complained of worsening pain and weakness following surgery, ultimately requiring additional surgery. The Attorney General also argued that the ALJ had erred in relying on EMGs and discograms to determine whether a surgery is needed.

Following its review of the record, including the ALJ's decision, exceptions filed by the parties and the evidence presented during the hearing, the Board, adopted "virtually all of the findings of fact and conclusions of law in [the ALJ's] Initial Decision . . . . " However, the Board rejected the ALJ's acceptance of Quartararo's explanation concerning the purported reasons his operative reports included references to the laminotomies he admitted he had not performed, finding instead that Quartararo had "prepared deceptive and false records" in violation of N.J.S.A. 45:1-21(b). Thus, the Board did not dismiss the fraud claims from counts one through five and eight, which had been previously dismissed by the ALJ.

The Board also reversed the ALJ's findings that Dr. Ashraf's testimony was not credible, concluding that the difference in testing as part of a determination for the necessity of surgery "reflect[s] the different approaches to patient care of [Quartararo's] and Dr. Ashraf, rather than a lack of credibility" on the part of Dr. Ashraf. The Board concluded that Quartararo had prepared deceptive and false records and had engaged in acts of fraud, misrepresentation and professional misconduct because Quartararo falsely claimed to have performed laminotomies on his operative reports. In reaching its determination, the Board relied on Quartararo's testimony that he had listed laminotomy on his operative reports despite the fact that no such procedures had been performed. The Board agreed with the ALJ that Quartararo's use of non-privileged co-surgeons to assist him with surgery—Drs. He and Ragukonis—constituted repeated acts of negligence in violation of N.J.S.A. 45:1-21(d).

On August 22, 2022, the Board filed its final decision, revoking Quartararo's license for a minimum of seven years from the date of voluntary surrender, April 5, 2019. The Board concluded that Quartararo's "misconduct warrants a serious penalty in excess of that recommended by [the ALJ]" and that he "flagrantly ignored, and in fact shattered professional norms when he engaged in sexual misconduct with patients Y.R. and K.D." The Board specifically noted

his attempts to cover up his misconduct, including paying K.D. money and having her sign fraudulent documents in an effort to prevent her from reporting his actions. The Board found Quartararo's conduct was "so egregious that the only appropriate discipline is a license revocation."

The Board also imposed an aggregate monetary sanction of $343,909.75, comprised of a civil penalty of $90,000, $61,684.75 in costs, and $192,225 in attorney's fees. The Board required Quartararo to complete a "post-licensure assessment program as part of his demonstration of fitness and competence to return to the practice of medicine and surgery." The Board also reserved the right to impose restrictions or limitations on Quartararo's practice, should his license be reinstated, and permanently barred him from "ownership of, employment in, or gaining financial benefit, either directly or through a third party, from any surgery center . . . ."

Quartararo appealed, arguing the following:

POINT I

THE SANCTION IMPOSED BY THE BOARD WAS ARBITRARY, CAPRICIOUS, UNREASONABLE, AND LACKING SUPPORT IN THE RECORD.

A. REVOCATION WAS A DISPROPORTIONATE PENALTY

B.    PENALTY FAR EXCEEDS THOSE IMPOSED IN SIMILAR CASES

POINT II

THE PENALTIES AND COSTS IMPOSED BY THE BOARD WERE ARBITRARY, CAPRICIOUS, UNREASONABLE, AND LACKING SUPPORT IN THE RECORD.

POINT III

THE CREDIBILITY DETERMINATION OF DR. ASHRAF WAS ARBITRARY, CAPRICIOUS AND WITHOUT SUPPORT IN THE RECORD.

POINT IV

THE BOARD IMPROPERLY MADE DETERMINATIONS AS TO CLAIMS NOT PLED IN THE COMPLAINT REGARDING MISREPRESENTATION.

A.    THE AMENDED COMPLAINT DID NOT CONTAIN AN ALLEGATION REGARDING MISREPRESENTATIONS REGARDING LAMINOTOMIES

B.    [THE ALJ] REVIEWED THE FACTUAL ISSUE AND FOUND NO WRONGDOING

POINT V

THE BOARD MADE FINDINGS OF FACT WITHOUT SUPPORT IN THE RECORD REGARDING USE OF CO-SURGEONS.

## II.

We review final agency decisions—not administrative law judges' initial decisions.  See DiBlasi v. Bd. of Trs., 315 N.J. Super. 298, 301 (App. Div. 1998); In re Dennis, 385 N.J. Super. 269, 375 (App. Div. 2006).  When an agency's final determination is based on the ALJ's findings of fact and credibility, we defer to those determinations.  See Burlington Bd. of Soc. v. G.W., 425 N.J. Super. 42, 47 (App. Div. 2012).  A reviewing board, however, is not bound by an ALJ's legal conclusions, see A.M.S. ex rel A.D.S. v. Margate City Bd. of Ed., 409 N.J. Super. 149, 159 (App. Div. 2009).  "[W]hile [ALJ]s have primary responsibility for conducting hearings in contested cases, the head of an agency will himself exercise the ultimate options of adopting, rejecting, or modifying the recommendations of the [ALJ] in each particular case[,]" and "it is the agency's choice that governs."  N.J. Bell Tel. Co. v. State, Dep't of Pub. Utils., Bd. of Pub. Util. Comm'rs, 162 N.J. Super. 60, 76–77 (App. Div. 1978).

"An administrative agency's final quasi-judicial decision will be sustained unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record."  In re Herrmann,192 N.J. 19, 27-28 (2007) (quoting Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011)).  "The burden of demonstrating that the agency's action was arbitrary,

31

capricious or unreasonable rests upon the party challenging the administrative action." A.M. v. Monmouth Cnty. Bd. of Soc. Servs., 466 N.J. Super. 557, 565 (App. Div. 2021) (alterations omitted) (quoting E.S. v. Div. of Med. Assistance & Health Servs., 412 N.J. Super. 340, 349 (App. Div. 2010)).

Our role in reviewing administrative actions is generally limited to three inquiries:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law;
>
> (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and
>
> (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [Allstars Auto Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018) (quoting In re Stallworth, 208 N.J. 182, 194 (2011)).]

Our review of disciplinary sanction determinations is limited. Div. of Alcoholic Beverage Control v. Maynards, Inc., 192 N.J. 158, 183 (2007). A court "has no power to act independently as an administrative tribunal or to substitute its judgment for that of the agency. It can interpose its views only where it is satisfied that the agency has mistakenly exercised its discretion or

misperceived its own statutory authority." In re License Issued to Zahl, 186 N.J. 341, 354 (2006) (quoting In re Polk License Revocation, 90 N.J. 550, 578 (1982)).

"In light of the deference owed to such determinations, when reviewing administrative sanctions, 'the test is whether such punishment is so disproportionate to the offense, in light of all the circumstances, as to be shocking to one's sense of fairness.'" In re Hendrickson, 235 N.J. 145, 159 (2018) (alteration in original) (quoting Herrmann, 192 N.J. at 28).

Quartararo argues the Board sanctions, financial costs and penalties are arbitrary, capricious and unreasonable and lack support in the record. More particularly, Quartararo does not challenge the Board's broad authority to impose a license revocation under N.J.S.A. 45:1–21, but he maintains the seven-year license revocation exceeds the punishment imposed on other physicians who had engaged in similar sexual misconduct with patients. He further asserts that because he had accepted responsibility for his sexual misconduct involving his two former patients, his initial consent to the suspension of his medical and surgical licenses, and the substantial unrebutted evidence of his professional therapy and rehabilitation efforts, the Board's revocation decision was too harsh.

By contrast, the Board asserts that Quartararo would have this court "substitute its judgment for the Board's by reversing the revocation of his license to practice medicine." Citing In re Zahl, 186 N.J. at 341, the Board also argues its "imposition of revocation is not arbitrary or capricious and finds ample support in the record, and should be affirmed."

In Zahl, the Attorney General filed an eight-count complaint against Zahl, a physician, alleging various acts of misconduct, including "dishonesty, fraud, deception, misrepresentation, false promise or false pretense," in violation of N.J.S.A. 45:1–21(b); gross and repeated acts of negligence and malpractice, in violation of N.J.S.A. 45:1–21(c) and (d); "professional or occupational misconduct," in violation of N.J.S.A. 45:1–21(e); the creation of false patient records, in violation of N.J.S.A. 45:1–21(h) and N.J.A.C. 13:35–6.5(b); and failure to maintain good moral character, in violation of N.J.S.A. 45:9–6. Id. at 344. None of the allegations in the complaint, however, related to the safety or quality of the patient care rendered. Id. The Board found that Zahl had willfully engaged in numerous dishonest acts over a course of years, including Medicare and insurance fraud and maintaining improper patient records, and thus revoked his medical license. Id. at 343. On appeal, we remanded the matter for reconsideration of the license-revocation penalty, reasoning that although Zahl's

behavior demonstrated a wide pattern of dishonesty, "there [was] no evidence that any patient's health or safety was even minimally compromised." Id. at 351. The Supreme Court reversed, holding the Board was within the bounds of its statutory authority and discretion in revoking Zahl's license after the Board had found Zahl to be a "fundamentally corrupt licensee." Id. at 343.

The Court in Zahl devoted substantial attention to the Board's authority to supervise the practice of medicine and the interplay between the Medical Practices Act (MPA), N.J.S.A. 45:9-1 to -27, and the Uniform Enforcement Act (UEA), N.J.S.A. 45:1-14 to -27. Zahl, 186 N.J. at 352. In doing so, the Court discussed the statutory and regulatory support for the Board's authority to adopt rules designed to protect the health, safety and welfare of patients. Id. at 352-53. The Court found the MPA grants the Board near exclusive authority to promulgate rules and regulations to protect patients and licensees. See also Brodie v. State Bd. Med. Exam'rs, 177 N.J. Super 523, 529 (App. Div. 1981) (stating "[T]he Board has broad authority to adopt rules designed to protect the health, safety and welfare of patients of its licensees.") (citations omitted).

Relying on the MPA, the Court in Zahl held that the Board's supervision of the medical field is critical to the Board's fulfillment of its "paramount obligation to protect the general health of the public." Zahl, 186 N.J. at 352

35

(citing In re Polk, 90 N.J. at 565); see also Brodie, 177 N.J. Super. at 529. Additionally, the Court found that under the MPA, a physician's licensure is contingent upon a physician maintaining good moral character. See N.J.S.A. 45:9-6 (requiring that applicants for medical licenses make a showing of good moral character); Polk, 90 N.J. at 576 (stating that N.J.S.A. 45:9-6's requirement of good moral character does not solely apply to those seeking licensure but is a continuing requirement).

The Zahl Court further discussed the interplay between the Board's authority under the MPA and the UEA, confirming the UEA's purpose was "to create uniform standards for 'license revocation, suspension and other disciplinary proceedings' by professional and occupational licensing boards[,]" and that the UEA works in tandem with the MPA to grant the Board disciplinary powers over medical licensees. Zahl, 186 N.J. at 353; N.J.S.A. 45:1-14; Del Tufo v. J.N., 268 N.J. Super. 291, 296 (App. Div. 1993). Those powers include the right to suspend or revoke the medical license of a physician on proof that the physician committed certain acts of misconduct. N.J.S.A. 45:1–21.

Quartararo asserts that the seven-year revocation of his medical and surgical licenses must be reversed because the penalty is disproportionate when compared to the Board's sanctions and penalties in other cases involving

allegations of sexual misconduct by physicians. Quartararo contends that the Board has an established practice of allowing doctors charged with sexual misconduct to return to practice after terms of license revocation shorter than the seven years imposed on him, with safeguards in place and after receiving the appropriate course of treatment. He further asserts that he is willing to comply with similar safeguards, including working with a chaperone, if he is permitted to return to practice. In further support of his argument, Quartararo cites to several Board decisions and unpublished court decisions that we do not consider.[9] See R. 1:36-3 ("No unpublished opinion shall constitute precedent or be binding upon any court"). The sole published case cited by Quartararo is In re Kim, 403 N.J Super. 378 (App. Div. 2008).

In Kim, we addressed the reasonableness of the Board's imposition of a reprimand against an obstetrician/gynecologist who had applied for a medical license in New Jersey after relocating from California. During the application process, Kim disclosed that he had settled a prior malpractice action involving his long-term relationship with a patient in his fertility practice, who happened

---

[9] "[A]s a general matter, unpublished opinions are not to be cited by any court absent certain specified circumstances" set forth in Rule 1:36-3. Badiali v. N.J. Mfrs. Ins. Grp., 429 N.J. Super. 121, 126 n.4 (App. Div. 2012). None of the specified circumstances exists here.

to be another doctor, a radiologist. The patient had filed a complaint with the California Medical Board after Kim ended the relationship. The matter, however, was settled in California with no admission of wrongdoing by Kim. After Kim moved to New Jersey and applied for a medical license, the Board issued a reprimand contemporaneously with the grant of a state medical license. Id. at 382. Quartararo cites to this case because Kim received only a reprimand even though Kim had a long-term sexual relationship with a patient.

In Quartararo's case, however, the Board determined that revocation was warranted because he preyed on two vulnerable patients, not one, employed intimidation and coercion tactics to dissuade at least one of his victims—K.D.—from testifying about the true nature of their relation, and resorted to making threats resulting in the issuance of a temporary restraining order against him.

The Board also determined that "[Quartararo] flagrantly ignored, and in fact shattered[,] professional norms when he engaged in sexual misconduct with patients Y.R. and K.D." and attempted to cover up his misconduct, including by "paying K.D. money, having her sign fraudulent documents in an effort to prevent her from reporting his actions to the Board, and threatening her." And the Board determined Quartararo's conduct "so egregious that the only appropriate discipline is a license revocation."

Kim is distinguishable because, unlike in Quartararo, there was no finding of sexual misconduct by the California Board, no admission of wrongdoing, and no adjudication of the merits of the allegations against Kim. Thus, Kim was in a position too dissimilar from Quartararo's such that we are not persuaded that Quartararo's penalty—license revocation—is disproportionate or unreasonable given the numerous, varied, and serious offenses the Board determined he had committed.

Applying the Court's analysis and holding in Zahl, we are persuaded that in assessing the appropriate sanction, the Board considered several relevant factors, including that he had: a sexual relationship with two patients with known mental health issues; prescribed mood stabilizer medications to at least one of his victims while she was spending the night at his home (K.D.); employed threats of force against K.D. in an effort to dissuade her from meeting with investigators and to conceal the extent of their relationship; and paid K.D. $20,916 prior to her scheduled meeting with investigators. After considering this evidence, the Board rejected Quartararo's arguments that he could safely return to practice medicine and surgery because of therapy he had undergone, stating "despite his assurances to the contrary, we do not believe that [he] is ready to return to practice."

A-0425-22

We review the Board's decision under an arbitrary-and-capricious standard. An agency's decision will be sustained unless there is "a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." Herrmann, 192 N.J. at 27. To determine whether a decision meets this standard, we weigh whether the agency has followed the law, whether the record contains substantial evidence to support the findings on which the agency based its action, and whether the agency reached a conclusion that could not have reasonably been made on a showing of the relevant factors. Id. at 355-56. And, it is Quartararo's burden to demonstrate that the Board's decision was arbitrary, capricious or unreasonable and he has failed to do so. Dep't. of Ins. v. Universal Brokerage Corp., 303 N.J. Super. 405, 409-10 (App. Div. 1997) (stating the party challenging an agency decision has the burden of proving the decision is arbitrary, capricious or unreasonable or is not supported by substantial credible evidence in the record). Contrary to Quartararo's arguments, he failed to satisfy this burden; the Board's decision is well-supported by undisputed and admitted facts including the details of his sexual relationships with Y.R. and K.D. The Board's decision is, thus, not arbitrary, capricious or unreasonable.

The Board enjoys broad statutory authority under N.J.S.A. 45:1–21, and there is nothing improper about the Board's consideration of the record to

40

support its modification of the ALJ's recommendation and its imposition of a greater penalty. Indeed, in Zahl the Court upheld the permanent revocation of a physician's license to practice medicine whose dishonest conduct was found to be egregious despite not involving sexual contact or harm to a patient. 186 N.J. at 341. See also In re Markoff License Revocation, 299 N.J. Super. 607, 613 (App. Div. 1997) (affirming the Board's decision not to reinstate the license of a physician who had been convicted of multiple separate acts of mail fraud, racketeering and racketeering conspiracy because the sanction did not "shock one's sense of fairness") (citing Polk, 90 N.J. at 578). Given our deferential standard of review, and in light of Zahl, we cannot conclude that the Board's decision was arbitrary, capricious, or unreasonable or that the record presented does not support a seven-year license revocation.

III.

In addition to generally arguing that the sanction and penalties imposed by the Board are arbitrary, capricious and unreasonable, Quartararo argues that the Board's determination that some of Dr. Ashraf's testimony was credible— while also finding other aspects of his testimony were not credible—was arbitrary, capricious and unreasonable, and without support in the record.

41

We note that the Board, after adopting the majority of the ALJ's recommended findings of fact and legal conclusions of law, modified the ALJ's findings of fact in two key areas based on its own review of the evidence and the medical expertise of its members. Specifically, the Board determined that Quartararo had inappropriately and fraudulently prepared operative reports for E.S., D.C., Y.O., L.V., D.E., and V.C. by referring to laminotomy procedures that he had not actually performed. And, the Board rejected the ALJ's findings that Dr. Ashraf was not credible because he gave no weight to EMGs or discograms and because he testified that it would be impossible to do a simultaneous surgery by two doctors despite Quartararo's video evidence depicting two surgeons performing surgery together.

In its decision, the Board explained that it reversed the ALJ's determination as to Dr. Ashraf's credibility because the ALJ had "failed to account for the differing perspectives of practitioners who take different approaches to treatment" and Dr. Ashraf's testimony that suggests he preferred to rely on MRIs of the patients to determine whether surgery was necessary over EMGs or discograms reflected his own preference but was not an indication that he lacked credibility as the ALJ had determined. Further, the Board noted that

42

it found "little, if any," probative value to Quartararo's video evidence because it did not demonstrate the relevant surgeries at issue.

The Board did not modify the ALJ's findings that each of the surgical procedures performed on E.S., D.C., Y.O., L.V., D.E., and V.C. met the standard of care but did not agree with the ALJ's acceptance of Quartararo's billing excuse for listing laminotomies in the six operative reports despite not performing laminotomies. The Board stressed the importance of accuracy in operative reports and found Quartararo's decision to list in the reports procedures that were not performed, constituted the use or employment of dishonesty, fraud, deception, misrepresentation, false promise or false pretense in violation of N.J.S.A. 45:1-21(b), and professional misconduct in violation of N.J.S.A. 45:1-21(e).

A Board's "duty of ensuring that the [ALJ]'s decision was based on a preponderance of the credible evidence[,]" and its authority to "reject or modify findings of fact, conclusions of law or interpretations of agency policy" are unquestionable. Polk, 90 N.J. at 560; N.J.S.A. 52:14B-10(c); see also De Vitis v. N.J. Racing Comm'n, 202 N.J. Super. 484, 490 (App. Div. 1985) ("[W]hile [ALJ]s have primary responsibility for conducting hearings in contested cases, the head of an agency will himself exercise the ultimate options of adopting, rejecting, or

modifying the recommendations of the [ALJ] in each particular case." (internal quotation marks removed)). "[W]here there is substantial evidence supporting" the result of the examiner and the agency, "it is the agency's choice that governs." N.J. Bell Tel. Co., 162 N.J. Super. at 77. "In rejecting or modifying any findings of fact, the agency head" must state the reason for rejecting the findings and "make new or modified findings supported by sufficient, competent, and credible evidence in the record." N.J.S.A. 52:14B-10(c).

Applying these well-settled legal principles that permit the head of an agency to adopt, reject, or modify, the recommendations as set forth in an ALJ's decision in administrative matters, we observe no error in the Board's modification of the ALJ's findings of fact after conducting its own review of the record and given the medical expertise of its members. The Board explained in detail the reasons it rejected some of the ALJ's findings. The Board reasoned that the ALJ's decision showed a failure to appreciate that different doctors rely on different approaches to treatment, noting Dr. Ashraf had urged reliance on MRIs, rather than EMGs or discograms, and Quartararo preferred to use all types of testing as part of a determination for the necessity of surgery. The Board concluded that a physician's alternative approach to surgery is not indicative of a lack of credibility. The Board also appropriately

considered that Dr. Ashraf's training and years of experience as an orthopedic spine surgeon further supported its finding that his testimony was credible.

We therefore have no quarrel with the Board's modification of the ALJ's recommendation as to Dr. Ashraf's credibility and its determination that Dr. Ashraf's testimony was credible and should not have been disregarded by the ALJ. The Board modified the ALJ's findings and conclusions solely related to the "inappropriateness and fraudulent" nature of Quartararo's preparation of the six operative reports for each of the named patients in the amended complaint, because the operative reports referenced laminotomies, which Quartararo admittedly did not perform.

In fact, the Board clarified in its decision that "all of [its] determinations as to penalty are based solely on the actual findings and conclusions as adopted and modified, and not on any of the charges which were not ultimately sustained." The Board further explained that it had not modified the ALJ's findings and conclusions that the Attorney General had not established that each of the six surgeries at issue were unnecessary or not properly performed as alleged in counts one through five and eight of the amended complaint. On this record, we perceive no error in the Board's decision.

IV.

Quartararo objects to the Board's modification of the ALJ's findings and its determination that he falsified patient records by labelling all procedures performed on E.S., D.C., Y.O., L.V., D.E., and V.C. as laminotomies for billing purposes. He contends that the Board erred because the ALJ found "no misrepresentations . . . by listing a laminotomy in the preamble to the operative report[s] for billing purposes." As we have previously explained, the Board may modify the ALJ's findings of fact and recommendations and a reviewing Board is not bound by an ALJ's legal conclusions. N.J.S.A. 52:14B-10(c).

Quartararo is correct that the Board considered his misuse of procedure codes in his operative reports for laminotomy—although he admittedly did not perform any laminotomies on E.S., D.C., Y.O., L.V., D.E., or V.C.—as a basis to increase the ALJ's recommended sanction. The Board stated, "[Quartararo]'s misconduct warrants a serious penalty in excess of that recommended by the ALJ." Quartararo also contends that he had relied upon a coding expert and was advised "the full code description was needed for reimbursement, not a partial description which would require deletion of the wor[d] laminotomy." Despite this explanation, however, Quartararo admitted he had not performed laminotomies and that he had used the laminotomy code to ensure that he would

be paid by insurance carriers. He did so rather than correctly coding the procedures he actually performed because of the risk he would otherwise not be paid.

In its decision, the Board expressly stated, "[a]lthough [the ALJ] accepted [Quartararo]'s explanation, we draw a different conclusion," and found that "[o]perative reports . . . must accurately reflect the procedures that a surgeon performed. That [Quartararo] chose to list a procedure that was not performed, even for billing purposes, is inappropriate." The Board found this practice to constitute the use or employment of dishonesty, fraud, deception, misrepresentation, false promise or false pretense in violation of N.J.S.A. 45:1-21(b), and professional misconduct in violation of N.J.S.A. 45:1-21(e).

The Board relied on In re Silberman, which held that the Board can apply expertise and specialized knowledge in evaluating a case, and concluded that operative reports must accurately reflect the procedures that a surgeon performed. 169 N.J. Super. 243, 256 (App. Div. 1979). In reaching this conclusion, the Board considered another critical fact: that the improper coding of these procedures "caused confusion for the experts in the matter" as is evident in Quartararo's own expert reports—the reports of Drs. Davis and Koh, which inaccurately stated that laminotomies were performed on patients, which the

Board attributed to the fact that the first page of the operative reports included "laminotomy."

Because the Board modified the ALJ's findings of fact and legal conclusions on the question of whether Quartararo had violated the law by mislabeling the operative reports for coding purposes, we apply a "careful appellate review." In re Lalama, 343 N.J. Super. 560, 565-66 (App. Div. 2001). Although not required to defer to an ALJ's findings, the Board "is not free to brush aside or disregard [them] without comment." Id. (quoting In re Waterfront Dev. Permit No. WD88-0443-1, 244 N.J. Super. 426, 436 (1990)). Our careful review of the record and the Board's reasoning for its modification of the ALJ decision persuades us that there is nothing objectionable about the Board's imposition of a penalty against Quartararo based on his admission that he miscoded surgical procedures to ensure payment, rather than to seek out a proper, legal resolution to any anticipated insurance coverage issues. Indeed, given the Board's statutory mandate to supervise the medical field, to ignore a critical issue such as the improper coding and indeed the falsification of patient records, as the Board also noted in its decision, would contradict that obligation. See In re Polk, 90 N.J. at 565. Under these circumstances, we reject Quartararo's arguments that reversal is warranted.

We next address Quartararo's arguments challenging the Board's determination that he violated the standard of care by performing various surgical procedures using co-surgeons who lacked the requisite privileges and credentials. Quartararo argues that the Board's "finding regarding negligence in the use of co-surgeons at surgery centers should be stricken, as arbitrary, capricious and without support in the record." He maintains that Drs. He and Ragukonis held "the relevant privileges at New Century[,]" but he incongruously admits that "the surgery center's failure to credential Dr. He was, in fact, an administrative oversight . . . ." He also maintains that the Board did not raise or allege in its amended complaint any issue concerning Dr. Ragukonis' privileges to serve as his co-surgeon and the Board, by its decision, "denied the doctor his basis due process rights." Quartararo asserts that he addressed this issue in his "exceptions brief" and provided documentation showing "relevant portions of Dr. Ragukonis' credentialing file including privileges held in 2016, which were in effect at the time of the procedure on Patient D.C."

In its decision, the Board acknowledged Quartararo's efforts to contest the ALJ's findings as to Dr. Ragukonis but determined that under N.J.A.C. 1:1-18.4(c), "evidence not presented at a hearing shall not be submitted as part of an exception . . . ." The Board accepted the ALJ's findings that there was no proof

that Dr. Ragukonis had privileges at the time of D.C.'s surgery, finding that under N.J.A.C. 1:1-18.4(c), Quartararo could not present new evidence in his exceptions suggesting that Dr. Ragukonis had the requisite privileges.

Based on this record, the Board's findings that Quartararo performed surgery with co-surgeons who did not have the requisite surgical privileges when they performed surgery on E.S., V.C., and D.C., is unassailable because Quartararo did not show at the OAL hearing that either Drs. He or Ragukonis had surgical privileges at ICMISS. The Board based its decision on the evidence adduced at the hearing and we see no basis to disturb its determination that Quartararo performed surgery with Drs. He and Ragukonis, who did not have the requisite privileges at the time.

In reviewing the Board's decision regarding the substantive allegations made against Quartararo, we reject Quartararo's arguments that the penalties imposed by the Board are arbitrary, capricious and unreasonable in light of all of the circumstances. We reach this determination based on our review of the Board's comprehensive decision, which emphasizes Quartararo's sexual misconduct with Y.R. and K.D. The Board's decision makes clear that Quartararo's sexual misconduct was central to its finding that license revocation was warranted for a minimum of seven years. In addition to finding that Quartararo "preyed" on Y.R. and K.D., the Board found that he "exploited their feelings for him," and that "[e]ven

absent the additional findings[,] . . . [Quartararo]'s misconduct evidences such a breach of [its] professional standard and the public trust that a stronger penalty [was] mandated to preserve the integrity of [the] profession and to protect the public." The Board condemned Quartararo's conduct and concluded that it did not believe that Quartararo was ready to return to practice despite his counseling, therapy and ethics courses. We discern no abuse of discretion in the Board's imposition of a seven-year lengthy but appropriate license revocation for Quartararo's egregious conduct.

V.

Finally, we consider Quartararo's assertions that the imposition of financial penalties in the amount of $340,000, inclusive of attorney's fees and costs is unsupported by the record and must be reduced. In support of this argument, Quartararo points to the fact that he was successful in defending against most of the counts in the amended complaint and argues that the fees are therefore disproportionate to the offense and shocking to one's sense of fairness.

The Attorney General's Office, sought attorney's fees on behalf of the Board in the amount of $307,560 and aggregate costs of $98,695.60, which was comprised of $51,636.60 in investigative costs, $37,900 in expert witness fees, and $9,159 in reporter and transcript fees.

51

The Board found that the application included "adequate documentation" warranting "entry of an order awarding all costs and fees."  At the request of both parties, the Board applied the "lodestar" principles established in Rendine v. Pantzer, 141 N.J. 292, 334-40 (1995), to the State's application and took notice of Poritz v. Stang, 288 N.J. Super. 217, 221 (App. Div. 1996)  Consistent with Rendine, the Board found the Attorney General's hourly rate reasonable and acknowledged that "the complexity of the subject matter and the seriousness of the allegations" warranted the "time and expense."  Significantly, however, "the vast majority of claims made in three of the eight counts of the amended complaint were dismissed." As a result, the Board reduced the amount of costs and attorney's fees from what the Attorney General sought by 37.5% and imposed $61,684.75 in costs and $192,225 in fees accordingly.

A fee award "will be disturbed only on the rarest of occasions, and then only because of a clear abuse of discretion."  Packard-Bamberger & Co. v. Collier, 167 N.J. 427, 444 (2001) (quoting Rendine, 141 N.J. at 317).  Moreover, it is well within the Board's authority to calculate and impose reasonable financial penalties and attorney's fees.

Because we are satisfied that the Board's fee award was based on "sufficient credible evidence in the record," and the correct application of the

analysis in <u>Rendine</u>, we reject Quartararo's arguments that the Board erred by imposing the financial penalty and costs.

To the extent we have not addressed any remaining arguments, we conclude they are without sufficient merit to warrant discussion in a written opinion.  <u>See</u> <u>R</u>. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0425-22